KING, Circuit Judge,
with whom POLITZ, Chief Judge, and JOHNSON, Circuit Judge,
join, dissenting:
The majority ably accomplishes what it set out to do in this case: reach the merits of this appeal so that it can overhaul the Voting Rights Act. Indeed, from its initial decision to deny the motion to remand filed by the Plaintiffs and the State of Texas, to its decision to reverse the district court’s judgment in each of the nine target counties, the majority proceeds with a kind of determination not often seen in a judicial opinion. Like Chiéf Judge Politz, I believe that the parties should be given the opportunity to settle this case. I also believe that fidelity to the Voting Rights Act requires us to affirm the district court’s judgment in eight of the nine target counties. Accordingly, I respectfully dissent.
The majority’s decision to deny the motion to remand, even standing alone, is indefensible. It demonstrates a lack of judicial restraint and sets a bad precedent. Under the majority’s reasoning, states and political subdivisions embroiled in section 2 lawsuits must now defend their electoral practices to the bitter end — unless those practices can be changed in accordance with state law and everyone who is even remotely connected with the lawsuit agrees to the proposed changes. Because these circumstances are unlikely to occur, the majority has effectively ensured that section, 2 cases will rarely, if ever, be settled.
In light of the majority’s seriously flawed decision on the merits of this case, however, its decision to deny the motion to remand becomes even more indefensible. In my view, the majority’s discussion of the merits — complete with a declaration that blacks and Hispanics are just two more interest groups and a conclusion that blacks and Hispanics are overrepresented on the Texas district court bench — perhaps provides the best argument against its decision to deny the parties’ motion to remand this case for a settlement hearing. In fact, it is only after reading the majority’s decision on the merits that one can truly understand why it denied the motion to remand. For that reason, I begin with the merits.
I. THE MERITS
In reversing the district court’s judgment, the majority ultimately concludes that the evidence of vote dilution in this case is “marginal” — too marginal to outweigh the State of *901 Texas’ substantial interests in maintaining the current system. I disagree with this conclusion on two fronts. First, I reject the majority’s assertion that the evidence of vote dilution in this case is weak. Under the established analytical framework for assessr ing section 2 claims, the Plaintiffs’ evidence of vote dilution is anything but weak; indeed, it is only by changing the rules that the majority can so characterize the evidence in this case. I also disagree with the majority’s determination that the State of Texas’ interests in maintaining its current at-large election system are substantial. In my view, these interests are little more than tenuous and therefore could not outweigh even “marginal” evidence of vote dilution.
A. The Plaintiffs’ Evidence of Vote Dilution: Overhauling a Congressional Statute
As explained in my earlier opinion, the evidence of vote dilution in this case is substantial. See League of United Latin American Citizens, Council No. 4434 v. Clements, 986 F.2d 728, 776-803 (5th Cir.1993) (LULAC III).[1] Had this ease been decided before today, the evidence in eight of the nine target counties would have pointed unerringly towards a finding of vote dilution. This evidence includes: a geographically compact and politically cohesive minority group; a white bloc vote that is usually sufficient to defeat the combined strength of minority and white crossover votes; a history of official discrimination against the minority group; the lingering socioeconomic effects of discrimination against the minority group; structural mechanisms, including giant election districts, that tend to enhance the dilu-tive nature of at-large election schemes; and an appalling lack of minority representation on the district court bench.
After today, such evidence will be only “weak” evidence of vote dilution. This is because the majority has changed the analytical framework for analyzing vote dilution claims. Along the way, the majority has distorted Congressional intent, rejected Supreme Court precedent, and completely altered the focus of the section 2 inquiry. As a result of the majority’s handiwork, the section 2 inquiry.is no longer a blended one which looks to the “past and present reality” of the local political landscape. See S. Rep. No. 417, 97th Cong., 2d Sess., at 30 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 208 [hereinafter S. Rep.]. Rather, it is one that looks only at the present, although paradoxically, not at reality.
1. Altering the Racial Bloc Voting Inquiries
The most glaring example of the majority’s efforts to reshape the section 2 inquiry is its redefinition of two closely-related terms— namely, “legally significant white bloc voting” under the threshold inquiry of Thornburg v. Cringles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), and “racially polarized voting” under the totality of circumstances inquiry. Before today, these terms have been widely understood by lower courts, as well. as by the Supreme Court, to have a descriptive meaning — a meaning that is completely in accord with section 2’s focus on results. The majority, choosing to ignore this wide consensus, acts as if it is writing on a clean slate. That is, the majority acts as if Congress and the Supreme Court have not spoken on these issues. Because I refuse to put on such blinders, I cannot join the majority’s decision to reformulate these terms.
a. The majority’s version of racial bloc voting
The majority’s formulation of “legally significant white bloc voting” under the Gingles threshold inquiry, as well as its view of racially polarized or racial bloc voting under the totality of circumstances inquiry, is confusing — to say the least. The majority spends some thirty pages at the front of its opinion explaining what these two- closely related terms require; yet at the end of the section entitled “Racial Bloc Voting,” all the reader knows is that more is required than showing (a) with regard to legally significant *902 white bloc voting, that minority-preferred candidates are consistently defeated by a white majority, and (b) for racially polarized voting, that minorities and whites vote differently. What more is required the majority does not expressly say.
Make no mistake about the majority opinion in this regard: it does redefine the terms of legally significant white bloc voting and racially polarized voting. To understand exactly what the majority “holds” with respect to these two terms, however, one must first go back to earlier opinions by Judge Higginbotham and then read the majority’s county-by-county analysis in this opinion. It is only then that the majority’s holding becomes comprehensible. Specifically, the majority holds that to establish legally significant white bloc voting and racially polarized voting, minority plaintiffs must, at the very least, negate partisan politics as an explanatory factor for the consistent defeat of their preferred candidates. The majority further implies — without deciding the issue — that minority plaintiffs may have to affirmatively prove racial animus in the electorate to meet their burden with respect to legally significant white bloc voting and racially polarized voting.
The starting point for understanding the majority’s vague approach to the racial bloc voting inquiries is Judge Higginbotham’s opinion in Jones v. City of Lubbock, 730 F.2d 233 (5th Cir.1984) (Higginbotham, J., specially concurring from denial of rehearing). This is where he first suggested that racial bloc voting requires a showing of racial animus in the electorate. He asserted:
The [racial bloc voting] inquiry is whether race or ethnicity was such a determinant of voting preference in the rejection of black or brown candidates by a white majority that the at-large district, with its components, denied minority voters effective voting opportunity.
Id. at 234. Judge Higginbotham further questioned whether racial bloc voting could be demonstrated without the use of a' multivariate regression analysis, which, he argued, would eliminate other possible causes of voting behavior — such as campaign expenditures, party identification, income, media use measured by cost, religion, name identification, or-distance that a candidate lived from any particular precinct. See id. at 234-35.
The racial animus theme was also present, albeit to a lesser extent, in Judge Higginbotham’s earlier dissenting opinion in this case, where he strongly disagreed with the panel majority’s definition of legally significant white bloc voting and racially polarized voting. In particular, he stated that the “consistent defeat” of minority-preferred candidates could not be “on account of race or color,” as required by section 2, unless it is tied to “racial bias in the electorate.” LULAC III, 986 F.2d at 846 (Higginbotham, J., dissenting). This, he further stated, “is the heart of section 2.” Id.; see also id. at 831 (“[T]he extent to which voting patterns are attributable to causes other than race is an integral part of the inquiry into racial- bloc voting____”).
It was also in this dissent, however, that Judge Higginbotham first advocated placing on plaintiffs the burden of “negating partisan politics” in order to show legally significant white bloc voting and racially polarized voting. That is, he appeared to retreat from his earlier, more rigid position of requiring minority plaintiffs to affirmatively establish racial animus in the electorate and instead described the plaintiffs’ burden as one of negating partisan politics. See LULAC III, 986 F.2d at 834. At that point, he was willing to limit the “inquiry into racial bloc voting'to determining whether divergent voting patterns are caused by partisan differences.” Id.; see also id. at 845 (“Proof of majority voting based on party affiliation prevents the showing of bloc voting required by Gingles.”). Thus, Judge Higginbotham’s earlier position in this case was that, where the evidence “shows that divergent voting patterns among white and minority voters are best explained, by partisan affiliation, ... plaintiffs have failed to establish racial bloc voting.” Id. at 833-34. In short, he would have required minority plaintiffs to show that the consistent defeat of their preferred candidates was not “readily attributable to partisan affiliation.” Id. at 834.
There are still vestiges of Judge Higginbotham’s earlier positions in the ma *903 jority opinion, although in the front of the opinion they are only expressed as “powerful arguments.” The majority asserts, on the one hand, that it “need not hold that plaintiffs must supply conclusive proof that a minority group’s failure to elect representatives of its choice is caused by racial animus in the electorate in order to decide that the district court’s judgment must be reversed.” Majority Opinion at 859. It notes, however, that a racial animus requirement could readily be inferred from the text and legislative history of section 2, as well as Supreme Court precedent. See id. at 859. The majority also asserts that there is “a powerful argument supporting a rule that plaintiffs!,] to establish legally significant racial bloc voting!,] must prove that their failure to elect representatives of their choice cannot be characterized as a ‘mere euphemism for political defeat at the polls.’ ” Id. at 859. In this regard, the majority explains that “[djescribing plaintiffs’ burden in terms of negating ‘partisan politics’ rather than affirmatively proving ‘racial animus’ would not be simply a matter of nomenclature.” Id. at 859. It notes: “A rule conditioning relief under § 2 upon proof of the existence of racial animus in the electorate would require plaintiffs to establish the absence of not only partisan voting, but also all other potentially innocent explanations for white voters’ rejection of minority-preferred candidates.” Id.
Ultimately, however, the majority purports not to resolve the debate between Judge Higginbotham’s two earlier positions. Whether the plaintiffs’ burden of proving bloc voting includes the burden of demonstrating racial animus in the electorate, or only the burden of negating partisan politics, we are told, “the result is the same.” Id. at 860. The district court’s judgment must be reversed, according to the majority, “[b]e-cause the evidence in most instances unmistakably shows that divergent voting patterns among white and minority voters are best explained by partisan affiliation” — thus leaving the Plaintiffs unable to “establish racial bloc voting.” See id. at 861.
That the majority has reformulated the concepts of legally significant white bloc voting and racially polarized voting becomes crystal clear in its application of the law to each county. In Dallas County, for example, the majority holds that the plaintiffs have not satisfied the third Gingles threshold requirement. It reasons:
The evidence in Dallas County clearly establishes that judicial elections are decided on the basis of partisan voting patterns. We are left with the inescapable conclusion that plaintiffs have failed to prove that minority-preferred judicial candidates in this county are consistently defeated by racial bloc voting. This is a failure to meet the threshold showing required by Gingles.
Id. at 877. The majority makes similarly explicit holdings in Midland, Lubbock, and Ector counties. See id. at 891-92 (holding that, because partisan affiliation, not race, caused the defeat of the minority-preferred candidate in Midland County elections, “[t]he plaintiffs have not established the third prerequisite of Gingles.”); id. at 893 (concluding that plaintiffs have not met the third Gingles factor because the evidence establishes that the voting patterns in Lubbock County resulted from party loyalty, not race); id. at 893 (“Plaintiffs have failed to meet the third prerequisite of Gingles ” because the “undisputed facts indicate that partisan affiliation controlled the outcomes of the general elections.”). Moreover, in Harris and Bexar counties, the majority strongly suggests that, because election outcomes appeared to result from partisan, politics, the Plaintiffs could not establish legally significant white bloc voting.[2]
*904 Thus, although the majority’s “holding” with respect to legally significant white bloc voting and racially polarized voting is confused and elusive — a paradigm of “fluidity and fixity,” see Majority Opinion at 858 — it is nonetheless a holding: Minority plaintiffs must now establish, at a minimum, that the racially divergent voting which consistently defeats their preferred candidates is not the result of partisan politics. Moreover, the majority hints that the plaintiffs’ burden in this regard may even be higher. That is, minority plaintiffs may have to demonstrate that racially divergent voting patterns are due to racial animus in the electorate in order to meet their burden under the legally significant white bloc voting and racially polarized voting inquiries.
b. Problems with the majority’s version of racial bloc voting
There are grave problems with the majority’s approaches) to legally significant white bloc voting and racially polarized voting. From a purely legal perspective, the majority’s reformulation of the terms simply cannot be supported. The majority’s approach is also flawed from a social science perspective. More importantly, however, the reformulation of these terms essentially eviscerates section 2 of the Voting Rights Act — at least in the context of partisan elections.
(i) Legal problems
The majority asserts that its definitions of legally significant white bloc voting and racially polarized voting are required by the language and legislative history of section 2, as well as Supreme Court precedent. I disagree.
This being a question of statutory interpretation, I turn first to the language of section 2. That section provides, in pertinent part:
(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class in numbers equal to their proportion in the population.
42 U.S.C. § 1973.
The language of this section does not, under a straightforward reading, require minority plaintiffs to “negate partisan politics” or demonstrate current racial animus in the electorate. The words “partisan politics” appear nowhere in the language of section 2. And although subsection (a) does require a link — a critical link — between the denial or abridgment of the right to vote and “race or color,” there is no indication that Congress used the phrase “on account of race or color” to require proof of either the absence of partisan politics or the presence of racial animus in the electorate. In fact, Congress emphasized that it used the phrase “ ‘on account of race or color’ to mean ‘with respect to race or color,’ and not to connote any required purpose of racial discrimination.” S. Rep. at 27-28 n. 109,1982 U.S.C.C.A.N. at 205-06 n. 109.
Nor does the legislative history accompanying the 1982 amendments to section 2 offer *905 any real support for the majority’s new definition of legally significant white bloc voting and racially polarized voting. In a bit of fancy footwork, the majority asserts that, pursuant to the Senate Report accompanying the amended section 2, racial bloc voting is established when “race is the predominant determinant of political preference.” Majority Opinion at 855. The Senate Report says no such thing. It states that, in considering the totality of the circumstances, courts should examine “the extent to which voting in the elections of the state or political subdivision is racially polarized.” S. Rep. at 29, 1982 U.S.C.C.A.N. at 206. Several pages later, in a section entitled “Responses to Questions Raised About the Results Test,” the Senate Report reads:
The Subcommittee Report claims that the results test assumes “that race is the predominant determinant of political preference.” The Subcommittee Report notes that in many cases racial bloc voting is not so monolithic, and that minority voters do receive substantial support from white voters.
That statement is correct, but misses the point. It is true with respect to most communities, and in those communities, it would be exceedingly difficult for plaintiffs to show that they were effectively excluded from fair access to the political process under the results test.
Unfortunately, however, there still are some communities in our Nation where racial politics do dominate the electoral process.
In the context of such racial bloc voting, and other factors, a particular election method can deny minority voters equal opportunity to participate meaningfully in elections.
Id. at 33, U.S.C.C.A.N. at 211. This passage, from which the majority lifts its definition of racial bloc voting, simply does not define the term. If anything, the reference to the statement “that in many cases racial bloc voting is not so monolithic, and that minority voters do receive substantial support from ivhite voters ” reinforces my view that the racial bloc voting inquiry looks only at the extent to which minorities and whites vote differently. See infra Part I.A.I.C.
Even more incredible, however, is the majority’s assertion that the Supreme Court’s definition of legally significant white bloc voting, as set forth in Justice Brennan’s opinion in Gingles, is still open to question. Five Justices joined the part of Justice Brennan’s opinion laying out the Gingles threshold requirements — including the requirement that minority plaintiffs “must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority’s preferred candidate.” 478 U.S. at 51, 106 S.Ct. at 2766. Moreover, contrary to the majority’s assertions otherwise, five Justices also joined in Part III.B.2. of Justice Brennan’s opinion, where he defined legally significant white bloc voting as “a white bloc vote that normally will defeat the combined strength of minority support plus white ‘crossover’ votes.” Id. at 56, 106 S.Ct. at 2769.
Although there was some disagreement over the appropriate framework for analyzing section 2 claims at the time Gingles was decided — specifically, from Justice O’Con-nor — recent Supreme Court cases confirm that the threshold test announced in Justice Brennan’s majority opinion still controls. In Voinovich v. Quitter, — U.S. -, -, 113 S.Ct. 1149, 1157, 122 L.Ed.2d 500 (1993), Justice O’Connor, writing for a unanimous Court, stated:
In Thornburg v. Gingles, supra, this Court held that plaintiffs claiming vote dilution must prove three threshold conditions. First, they must show that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district. Second, they must prove that the minority group is politically cohesive. Third, the plaintiffs must establish that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority’s preferred candidate.
(emphasis added) (internal quotations omitted) (ellipsis in original). The Court similarly embraced the Gingles threshold test, as formulated by Justice Brennan, in Growe v. Emison, — U.S.-,-, 113 S.Ct. 1075, *906 1084, 122 L.Ed.2d 388 (1993), another unanimous opinion.
Thus, when the majority reformulates the third Gingles threshold factor and requires minority plaintiffs to negate the existence of partisan politics (or possibly to prove racial animus in the electorate), it does so in the face of binding Supreme Court precedent. Moreover, even assuming that Gingles did not decide the question of what constitutes legally significant white bloc voting and racially polarized voting, I still cannot agree with the majority’s rendition of the various opinions in the case.
The primary disagreement in Gingles concerned Justice Brennan’s statement that “the reasons black and white voters vote differently have no relevance to the central section 2 inquiry.” 478 U.S. at 63, 106 S.Ct. at 2772 (emphasis added). Justice O’Connor, writing for three other Justices, disagreed. She rejected Justice Brennan’s assertion that explanations for racially divergent voting patterns “can never affect the overall vote dilution inquiry," id. at 100, 106 S.Ct. at 2792 (emphasis added), and cited two examples of how such explanations might affect it. First, she noted:
Evidence that a candidate preferred by the minority group in a particular election was rejected by white voters for reasons other than those which made that candidate the preferred choice of the minority group would seem clearly relevant in answering the question whether bloc voting by white voters will consistently defeat minority candidates.
Id. (emphasis added). She also believed that “Congress intended that explanations of the reasons why white voters rejected minority candidates would be probative of the likelihood that candidates elected without minority support would be willing to take the minority interests into account.” Id. Contrary to the majority’s assertions, however, Justice O’Connor did not “maintain[] that evidence that white and minority voters generally supported different candidates did not constitute legally significant racial bloc voting where these patterns were attributable to partisan affiliation rather than the race of the candidate.” Majority Opinion at 856. On this issue, she stated:
Insofar as statistical evidence of divergent racial voting patterns is admitted solely to establish that the minority group is politically cohesive and to assess its prospects for electoral success, I agree that defendants cannot rebut this showing by offering evidence that divergent racial voting patterns may be explained in part by causes other than race.
Gingles, 478 U.S. at 100, 106 S.Ct. at 2792 (emphasis added). This statement suggests that evidence that divergent voting patterns are explained in part by partisan affiliation will not preclude a finding of legally significant white bloc voting — a finding which bears directly on the minority group’s “prospects for electoral success.”[3]
The secondary disagreement in Gingles concerned Justice Brennan’s statement that “the race of the candidate per se is irrelevant to racial bloc voting analysis.” 478 U.S. at 67, 106 S.Ct. at 2775. Justice White disagreed with this statement, as did Justice O’Connor. Specifically, they both argued that the race of the candidate is relevant to the racial bloc voting inquiry. See id. at 83, 101, 106 S.Ct. at 2782, 2792. That the race of the candidate is relevant to the racial bloc voting inquiry, however, does not translate to a requirement that minority plaintiffs must negate partisan politics or prove racial ani *907 mus in the electorate in order to demonstrate polarized voting.
Finally, I must say a few words about the Supreme Court’s decision in Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), upon which the majority places heavy reliance. The outcome in that case — i.e., the Supreme Court’s reversal of the district court’s vote dilution finding — did not, in my view or in Congress’ view, turn on the absence of racial bloc voting. Rather, as Congress indicated in the Senate Report accompanying the 1982 amendments to section 2, the district court’s error in Whitcomb was finding vote dilution “on the basis of proof that black ghetto residents with distinct] legislative interests had been consistently underrepresented in the legislature in comparison with their proportion of the population.” S. Rep. at 20, 1982 U.S.C.C.A.N. at 198; see also id. at 23, 1982 U.S.C.C.A.N. at 200 (“Whitcomb ... recognized that, in order to prevail, plaintiffs had to prove more than that minority members had not elected legislators in proportion to their percentage of the population.”). Also significant to the outcome in Whitcomb, in Congress’ view, was the fact that nine blacks had won at-large elections in the time period studied in Whitcomb. See id. at 21, 1982 U.S.C.C.A.N. at 198.[4] Significantly, Congress never interpreted Whitcomb to require minority plaintiffs to prove that the consistent defeat of their preferred candidates is not the result of partisan politics. As explained more fully in my earlier opinion, Whitcomb stands for the proposition that where there is evidence of partisan voting or interest group politics and no evidence that members of the minority group have an unequal opportunity to participate in the political process on account of race or color, the minority group’s vote dilution claim will fail. See LULAC III, 986 F.2d at 808-10.
(ii) Social science problems
Even without the legal problems inherent in the majority’s approach to legally significant white bloc voting and racially polarized voting, the majority’s approach is severely flawed from a social science perspective. Regardless of whether the majority requires a multivariate regression analysis, which would seek to eliminate all causes of voting behavior other than race, or only a trivariate regression analysis, which would attempt to eliminate partisan affiliation, there is a problem with requiring this type of evidence as an integral part of the vote dilution inquiry: it ignores the critical distinction between experimental research and non-experimental research. . Specifically, it ignores the warning of most respected social scientists, including the experts who testified in this case,[5] that the causes of voting behavior cannot be determined from the use of any kind of regression analysis — whether bivariate, trivariate, or multivariate.
It is important to recognize that the kind of evidence that the majority requires minority plaintiffs to introduce will involve no experimental manipulation of independent variables. The plaintiffs will not be able to manipulate the race or party affiliation of the candidate to determine which one had the greater effect on election outcomes. Rather, the plaintiffs will have to take existing election results and work backwards. This kind of real world research has been labelled “wow-experimental research” by social scientists. See Elazar J. Pedhazur, Multiple *908 Regression in Behavioral Research: Explanation and Prediction 175 (2d ed. 1982).
There are two main problems with inferring causation on the basis of regression analyses in the context of non-experimental research:
First, variables used in nonexperimental research may be, and often are, proxies for causal variables that are not included in the regression equation.... Needless to say, manipulating a proxy variable will not bring about a desired effect regardless of the magnitude of the regression coefficient associated with it. Yet, one encounters frequently not only the interpretation of proxies as if they were causal variables but also recommendations for policy decisions on the basis of such interpretations____
Second, variables in nonexperimental research tend to be intereorrelated. Since more often than not researchers neither understand the causes of the interrelations nor attempt to study them, implications of regression coefficients for policy decisions are questionable.
Pedhazur, supra, at 224.
Requiring minority plaintiffs to come forward with a multivariate regression analysis to determine the causes of racially divergent voting patterns, as Judge Higginbotham originally advocated in City of Lubbock, see supra Part I.A.l.a., would implicate the second problem described above. The independent variables listed by Judge Higginbotham — including incumbency, campaign expenditures, party identification, income, media use measured by cost, religion— “tend to be correlated, sometimes substantially.” Pedhazur, supra, at 224. Therefore, “it [becomes] difficult, if not impossible, to untangle the effects of each variable.” Id. By inferring causation from such analysis, we would undoubtedly be engaging in what amounts to an “almost mindless interpretation] of regression analysis in nonexperi-mental research.” Id. at 223. In short, we would be importing “junk science” into the Voting Rights Act while rejecting it in other contexts.[6]
Requiring minority plaintiffs to only come forward with a trivariate regression analysis, as the majority seems to do in this case, does not alleviate the social science problems; it only multiplies them. Not only does such a requirement ignore the fact that the two independent variables (i.e., race and partisan affiliation) are substantially correlated, it also runs the risk that the two variables being studied are only proxies for causal variables that are not included in, the regression equation. Indeed, the majority’s position in this case directly conflicts with Judge Higginbotham’s statement in City of Lubbock, where he criticized a bivariate regression analysis for “ignoring] the reality that race or national origin may mask a host of other explanatory variables.” 730 F.2d at 235. That is, a trivariate regression analysis such as the one now effectively required by the majority ignores the reality that race or partisanship “may mask a host of other explanatory variables.”
The trivariate regression analyses offered in this case undoubtedly demonstrate that *909 the party affiliation of a candidate is a better predictor of electoral success than the race of the candidate. Because we are dealing with non-experimental research, however, I cannot take the leap that the majority makes— namely, that the party affiliation of a candidate is the best, or the single most powerful, explanation of electoral success. The evidence in this case also demonstrates that, in many of the counties, race is substantially correlated with party affiliation, and the trivariate regression analyses offered in this ease did not determine, and could not have determined, why people join certain parties. In my view, then, they can no more explain why people vote the way they do than a bivariate regression analysis. Significantly, for purposes of the Voting Rights Act, they could not negate “race or color” as an explanation for election outcomes.
(iii) The practical problem
The majority’s approach to legally significant white bloc voting and racially polarized voting places an almost insurmountable hurdle in front of minority groups proceeding under section 2. Unless minority plaintiffs can successfully establish that voters in the controlling political party are racially motivated — either through the use of questionable voting statistics or by calling people from that party and asking them why they voted the way they did[7] — their claim will fail. In fact, they will not even be able to make out a prima facie case.[8]
The typical section 2 vote dilution case— i.e., where a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by minority and white voters to elect their preferred candidates— has two prominent features: One is a politically cohesive minority group (e.g., blacks or Hispanics) whose members share political interests and vote together, usually in a single political party that also includes whites. The other is the existence of a white majority, *910 generally in a different political party, whose voting strength is sufficient usually to defeat the combined strength of minority votes plus white “crossover” votes. The problem for minority voters in the typical section 2 case is that they have been submerged in a white majority — unable to forge a coalition with enough whites to elect representatives of their choice. Thus, the Voting Rights Act, as interpreted in Gingles and succeeding cases, presupposes partisan voting and asks whether politically cohesive minority voters have an unequal opportunity to participate in the political process — a partisan political process — and to elect representatives of their choice on account of race or color.
Under the majority’s reasoning, this typical scenario, the scenario specifically contemplated by the Gingles framework, will now preclude a finding of vote dilution. As long as some whites vote with minorities in the Democratic Party, partisan affiliation will always be a better predictor of election outcomes than race (even if a few minorities vote Republican). Such circumstances, under the majority’s framework, will preclude a finding of vote dilution. In short, the majority has effectively eviscerated section 2 of the Voting Rights Act in communities where there is any measurable crossover voting by whites.[9]
In sum, in the context of a challenge to an at-large election scheme, there are two ways to view a politically cohesive minority group, which, despite the support of some whites, is consistently unable to elect representatives of its choice. I view it as one factor suggesting vote dilution — i.e., that a minority group is submerged in a white majority and unable, despite the support of some whites, to elect representatives of its choice. The majority calls this merely interest group politics.[10] Of course, in calling this interest group politics, the majority treats a racial or language minority group as a mere “interest group” rather than as a politically cohesive minority group striving to make its voice heard.
c. A more reasonable approach to racial bloc voting, causation, and voters’ motivations
Rather than altering the section 2 framework and requiring minority plaintiffs to negate partisan politics (or perhaps to prove racial animus in the electorate) in order to make out a prima facie case of vote dilution, I would adhere to the framework established by the language of section 2, as interpreted by the Supreme Court and this court. To make out a prima facie case of vote dilution, a minority group would have to satisfy the Gingles threshold inquiry by demonstrating: (1) that it is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) that it is politically cohesive; and (3) that the white majority votes sufficiently as a bloc to enable it — in the absence of special circumstances — usual *911 ly to defeat the minority’s preferred candidate. Gingles, 478 U.S. at 48-51, 106 S.Ct. at 2765-67. Once the minority group satisfied the Gingles threshold inquiry, it would have to put on evidence of the totality of the circumstances to demonstrate: (1) that it has an unequal opportunity to participate in the political process and elect representatives of its choice, see 42 U.S.C. § 1973(b); and (2) that this unequal opportunity to participate and elect is tied to race or color, see 42 U.S.C. § 1973(a). See also LULAC III, 986 F.2d at 754-55.
To satisfy the third Gingles threshold requirement — i.e., legally significant white bloc voting — I would not require minority plaintiffs to either negate partisan politics or prove racial animus in the electorate. Rather, as I explained in my earlier opinion, minority plaintiffs would have to demonstrate “a white bloc vote that normally will defeat the combined strength of minority support plus white ‘crossover’ votes.” LULAC III, 986 F.2d at 745 (quoting Gingles, 478 U.S. at 56, 106 S.Ct. at 2769). This is not necessarily an easy burden. Minority plaintiffs would have to demonstrate, with a fair degree of predictability, the white majority’s success. See Gingles, 478 U.S. at 51, 106 S.Ct. at 2766. They could not rely on the loss of an occasional election to establish legally significant white bloc voting. See id.
I would similarly look to objective factors in analyzing, under the totality of the circumstances, “the extent to which voting in the elections of the state or political subdivision is racially polarized.” S. Rep. at 29, 1982 U.S.C.C.A.N. at 206. That is, I reject the argument that “racially polarized voting,” as used in the Senate Report, means racially motivated voting or voting caused by racial animus in the electorate. See LULAC III, 986 F.2d at 748. For the reasons discussed above, I also reject the majority’s more strained, alternative interpretation of this requirement — that racially polarized voting is voting not caused by partisan.affiliation. Finally, although I would hold that the elections most relevant to the racial bloc voting inquiry are those in which a minority candidate opposes a white candidate, I would not characterize racially polarized voting as “the tendency of citizens to vote for candidates of their own race.” See id. In my view, racially polarized voting is established when “there is a consistent relationship between [the] race of the voter and the way in which the voter votes, ... or to put it differently, where [minority] voters and white voters vote differently.” Gingles, 478 U.S. at 53 n. 21, 106 S.Ct. at 2768 n. 21.
This is not to say that the causes of racially divergent voting patterns, or voters’ motivations, are irrelevant to the section 2 inquiry. Such causes are relevant to the white bloc voting inquiry under the Gingles threshold test, but only to the extent that they call into question the consistency with which the white bloc will oppose minority-preferred candidates. See LULAC III, 986 F.2d at 745-46 n. 6.[11] The causes of racially divergent voting patterns are also relevant to the totality of circumstances inquiry. If it can be shown that white voters who consistently vote against minority-preferred candidates are motivated by racial animus, such proof could be a signal of vote dilution. See id. at 753-54. As Justice O’Connor explained in her Gingles concurrence, in “a community that is polarized along racial lines, racial hostility ” may create even more of a barrier to participation in the political process. See 478 U.S. at 100, 106 S.Ct. at 2792 (emphasis added). It might, for example, affect the *912 “likelihood that candidates elected without decisive minority support would be willing to take the minority’s interests into account.” Id. For the same reasons, proof that white voters are not motivated by racial animus would also be relevant to the totality of circumstances inquiry. The absence of proof of racial animus, however, should not weigh heavily against minority plaintiffs proceeding under section 2. “[B]ecause overt political racism has decreased over time, racial animus in the electorate may be difficult, if not impossible to detect.” LULAC III, 986 F.2d at 754 (citing United States v. Marengo County Comm’n, 731 F.2d 1546, 1571 (11th Cir.), cert. denied, 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984)).
By refusing to make racial animus in the electorate the focus of the vote dilution inquiry, I am not attempting to sever section 2 from its constitutional underpinnings. Minority plaintiffs ultimately have the burden, under the totality of circumstances inquiry, to demonstrate that their inability to participate in the political process and elect representatives of their choice is “on account of race or color.” See LULAC III, 986 F.2d at 754-55. This inquiry is not a narrow one that focuses on the present motivation of voters, but a blended one that focuses on the past and present reality of the local political landscape. See S. Rep. at 30, 1982 U.S.C.C.A.N. at 208. Minority plaintiffs can meet this burden by demonstrating some mix of factors under the totality of the circumstances — such as the existence of racially polarized voting, a history of official discrimination, the lingering socioeconomic effects of discrimination, racial campaign appeals, and other features of the current or past racial climate. See LULAC III, 986 F.2d at 755.
Unlike the majority, then, I cannot conclude that the district court clearly erred in finding legally significant white bloc voting and racially polarized voting in Texas district court elections — at least with respect to eight of the nine counties at issue in this case. The Plaintiffs offered evidence sufficient to support the district court’s findings that the white bloc vote in Bexar, Dallas, Ector, Harris, Jefferson, Lubbock, Midland, and Tar-rant counties will usually defeat the minority’s preferred candidate. The Plaintiffs also offered substantial statistical evidence of racially polarized, or racially divergent, voting patterns. The district court’s findings with respect to these specific inquiries are plausible in light of the record viewed as a whole; therefore, they are not clearly erroneous.
Nor can I join the majority’s conclusion that the district court, by stating that the causes of racially divergent voting patterns are irrelevant to the section 2 inquiry, committed reversible error. The district court was, admittedly, wrong to suggest that the causes of racially polarized voting are irrelevant; however, the evidence offered by the State of Texas in this case concerning the causes of racially divergent voting patterns is insufficient, in my view, to negate or undercut the district court’s ultimate finding, in eight of the nine counties, that blacks and Hispanics have an unequal opportunity to participate in the political process and elect representatives of their choice “on account of race or color.” See LULAC III, 986 F.2d at 803-13. The trivariate regression analyses offered by the State Defendants simply do not explain why people vote the way they do. Even under the majority’s narrow view of the section 2 inquiry, they do not negate “race or color” as an explanation for the inability of minorities to elect representatives of their choice.[12] Moreover, as explained in LULAC III, uninformed and straight-ticket voting along party lines can, and in this case does, reinforce minority voters’ unequal access to the political process. Id. at 812.
2. Other Examples of Alterations in the Section 2 Inquiry
In its efforts to overhaul section 2, the majority does not stop at reformulating the white bloc voting and racially polarized voting inquiries. It also changes — in some instances, sua sponte — the rules with respect to several other specific inquiries under the totality of the circumstances. In particular, the majority (a) now uses the lingering socioeconomic effects of discrimination as a factor *913 arguing against a finding of vote dilution, (b) declares that the history of official discrimination against blacks and Hispanics is to be entitled to little weight, (c) makes certain factors indicative of current racial bias “particularly” important under the totality of circumstances inquiry, and (d) aggregates blacks and Hispanics in two of the counties, even though no one sought to do so in the district court. By further altering the section 2 framework, the majority can confidently conclude that the evidence of vote dilution in this case is “weak.”
a. Lingering socioeconomic effects-of discrimination: the paucity of minority lawyers
The majority concludes that the Plaintiffs’ vote dilution case in each of the counties is weakened by the indisputable fact that, in all of the counties, the percentage of minority lawyers is much smaller than the percentage of minority voters. The appalling lack of minority judges on the Texás district court bench does not point towards vote dilution, we are told, because “[t]he absence of eligible candidates goes a long way in explaining the absence of minority judges.” Majority Opinion at 866. Indeed, the majority proclaims that minorities are overrepresented on the district court bench. It argues, on the one hand, that the Voting Rights Act is “not an unbridled license — to explore for example the persistent low enrollment of black law students.” Id. at 893. It then suggests, however, that blacks are somehow responsible for their own plight — i.e., for their persistent low enrollment in law school. See id. at 893-94.[13]
I cannot agree with the majority that the lack or absence of minority lawyers undercuts the Plaintiffs’ vote dilution case. First, in assessing the extent to which minority candidates have been elected to public office, the appropriate comparison pool has always been the number of minorities in the population. See 42 U.S.C. § 1973(b) (“The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class in numbers equal to their proportion in the population”); see also LULAC III, 986 F.2d at 750-52.[14] Second, in most of the counties at issue in this case, there are numerous minority lawyers who are well-qualified for the job of Texas district court judge. According to the State of Texas’ own exhibits, there are hundreds of eligible minority lawyers in Bexar (317 eligible Hispanics), Dallas (184 eligible blacks), and. Harris counties (446 eligible blacks). There are also significant numbers of minority lawyers in several of the other counties. As the district court correctly found, “even if there is some'relationship between the low number of minority judges and the number of eligible minority lawyers, that fact does not explain why well qualified eligible minority lawyers lose judicial elections.”
Even more inexcusable, however, is the majority’s refusal to recognize that the comparative lack of minority lawyers constitutes evidence of the lingering socioeconomic effects of discrimination, which argues in favor of a vote dilution finding. The Senate Report accompanying the amended section 2 instructs courts to consider “the extent to *914 which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process.” S. Rep. at 29, 1982 U.S.C.C.A.N. at 206. The majority recognizes, as it must, that no one has “questioned [Plaintiffs’ assertion that disparities between white and minority residents in several socioeconomic categories are the tragic legacies of the State’s discriminatory practices.” Majority Opinion at 866. The Plaintiffs introduced exhibits in each of the counties showing that minorities lag unreasonably behind whites in terms of income, education, and employment. Along these lines, it cannot seriously be disputed that the lack of eligible minority lawyers is in no small part the result of past racial discrimination in Texas schools — discrimination that remains unremedied in some cases even to this day.[15]
Nor can one seriously dispute that this lingering socioeconomic effect of discrimination hinders the ability of minorities to participate in the political process. Contrary to the majority’s suggestions otherwise,[16] “[t]he requirement that the political processes leading to nomination and election be ‘equally open’ to participation by the group in question extends beyond formal or official bars to registering and voting, or [even] to maintaining a candidacy. ” Id. at 30, 1982 U.S.C.C.A.N. at 208 (emphasis added); see *915 also Shaw v. Reno, — U.S. -, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (noting that the success of the Voting Rights Act of 1965 in reducing the spread between black and white voter registration did not suffice to root out other racially discriminatory voting practices, such as multi-member or at-large electoral systems); Reynolds v. Sims, 377 U.S. 533, 555 n. 29, 84 S.Ct. 1362, 1378 n. 29, 12 L.Ed.2d 506 (1964) (“There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth.”). That is, the question of whether the lingering socioeconomic effects of discrimination hinder the ability of minorities to participate in the political process is much broader than asking whether they register and vote at rates equal to whites. See S. Rep. at 6, 1982 U.S.C.C.A.N. at 183 (noting that “registration is only the first hurdle to full effective participation in the political process”); id. at 30 n. 120, 1982 U.S.C.C.A.N. at 208 n. 120 (“[T]he conclusion ... that in fact [minorities] ha[ve] registered and voted without hindrance” is not dispositive under section 2). One aspect of the ability to participate in the political process must surely include the ability to run for the office, and as long as minorities continue to bear the effects of past discrimination in education and employment, their ability to participate in the Texas district court political process will be severely hindered. See Tex. Const, art. V, § 7 (establishing eligibility requirements for district court judges).
Thus, like the majority, I would hold that the relative lack of eligible minority candidates is relevant to the section 2 inquiry. Unlike the majority, however, this indisputable fact would not argue against a finding of dilution; it would be compelling evidence of the extent to which blacks and Hispanics continue to “bear the effects of discrimination in such areas as education [and] employment, ... which hinder their ability to participate effectively in the political process.” S. Rep. at 29, 1982 U.S.C.C.A.N. at 206.[17]
b. Past official discrimination
The majority also suggests that the long history of discrimination against blacks and Hispanics in Texas is entitled to little, if any, independent weight under the totality of the circumstances. The majority recognizes that “Texas’ long history of discrimination against its black and Hispanic citizens in all areas of public life is not the subject of dispute.” Majority Opinion at 866. However, in discussing the totality of the circumstances in its application of the law to each county, the majority brushes over this history as if it were somehow irrelevant to the section 2 inquiry. I cannot join this decision to amend section 2.
The Senate Report specifically instructs courts to consider, as an independent factor under the totality of the circumstances, “the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the political process.” S. Rep. at 28, 1982 U.S.C.C.A.N. at 206. By including this factor as a signal of vote dilution, Congress made a legislative decision, which we must respect, that evidence of past discrimination — even standing alone — is a factor pointing toward vote dilution under *916 section 2. Indeed, in amending section 2 and enacting the results test, Congress intended to remedy past discrimination. It expressly found “that voting practices and procedures that have discriminatory results perpetuate the effects of past purposeful discrimination.’’ Id. at 40, 1982 U.S.C.C.A.N. at 218 (emphasis added). The majority effectively ignores this legislative decision by requiring Plaintiffs to demonstrate that the effects of past discrimination “actually hamper the ability of minorities to participate.” Majority Opinion at 866.
The majority thus attempts, in the words of Charles Black, Jr., to “uncouple present from past.” Charles L. Black, Jr., And Our Posterity, 102 Yale L.J. 1527, 1529 (1993). As Professor Black aptly observes, however,
This disconnection of present from past ... cannot be made to seem successful today, any more than in 1883. American slavery lasted more than two centuries, not too far from twice the time since its abolition. Even abolition was not the end. Quite soon after the Civil War, the national effort to remedy the situation of the newly free was as good as abandoned; in the places where most of them lived they .were not even so much as allowed to vote in the only election that counted; per capita public expenditures in public schools for their children ran far below — sometimes by a factor of one to ten — expenditure in white schools. The paradox of “separate but equal,” improvised — like the white primary — with a broad knowing wink, not only imprisoned black people in these schools, but also cut off all black people, children and grown-ups, from any kind of equal participation in the common life of the community.
Id. at 1529-30; see also supra note 15.
The simple fact is that blacks and Hispanics in Texas have indisputably been the victims of official discrimination in all areas of life. The district court was warranted in taking judicial notice of this history, and in giving it weight in deciding whether the Plaintiffs demonstrated an inability to participate in the political process and elect representatives of their choice “on account of race or color.” For the majority to suggest otherwise is to “publish a general Act of Oblivion.” Black, supra, at 1530. I will not join such an act.
c. The elevation of several factors under the totality of circumstances inquiry
The majority further reveals its intent to shift the focus of the section 2 inquiry by elevating certain factors under the totality of the circumstances. In particular, the majority states that, in determining the strength of a vote dilution case, courts must consider, among other things: the willingness of the racial or ethnic majority to give their votes to minority candidates of their own party; whether the minority plaintiffs have found proof of racial campaign appeals; and whether elected officials were found to be non-responsive to the needs of minority voters.
These factors are undoubtedly relevant to the section 2 inquiry, but to elevate them, as the majority does, changes the focus of the analytical framework. All of them — the willingness of white voters to vote for minority candidates of their own race,[18] the existence *917 of racial campaign appeals, and the responsiveness of elected officials — are concerned primarily with current racial animus in either the electorate, in candidates, or in elected officials. In my view, current racial hostility is not the ultimate focus of section 2. See supra Part I.A.l.e.
Moreover, elevating these factors ignores Congress’ instructions in the Senate Report that “there is no requirement that any particular number of factors be proved, or that a majority point one way or the other.” S. Rep. at 29, 1982 U.S.C.C.A.N. at 207. In particular, it ignores the statement in the Senate Report that “[ujnresponsiveness is not an essential part of plaintiffs case.”). Id. at 29 n. 116; 1982 U.S.C.C.A.N. at 207; see also United States v. Marengo County Comm’n, 731 F.2d at 1571 (The absence of racial campaign appeals “should not weigh heavily against a plaintiff proceeding under the results test of section 2.”). Unlike the majority, then, I would not elevate these factors under the section 2 inquiry.
d. Forcing minority groups to proceed as a coalition
Finally, the majority demonstrates the extent to which it will go to overhaul section 2 (and to preserve Texas’ method for electing district court judges) by holding that the district court clearly erred in refusing to give equal weight to elections involving whites and Hispanics in Harris and Tarrant counties. In both of these counties, Plaintiffs proceeded only on behalf of black voters. The majority, noting that political cohesion is a “question of fact” and not a strategic card, makes a finding of fact on appeal that blacks and Hispanics in these two counties are politically cohesive. It makes this fact finding even though the parties never requested the district court to do so.[19]
By making this finding, the majority shows a complete lack of judicial restraint. Regardless of what one thinks about allowing various minority groups to voluntarily combine themselves for section 2 purposes,[20] it is *918 clear that, if such coalition minority groups are permitted, “proof of minority political cohesion is all the more essential.” Growe v. Emison, — U.S. at -, 113 S.Ct. at 1085. In my view, it is not within the power of a federal appellate court to make this fact finding' — especially where none was requested below.
3. The Result of the Majority’s Handiwork
In sum, I reject the majority’s characterization of the evidence of vote dilution offered in this case. It can only be characterized as weak by altering the section 2 inquiry, which the majority does freely. No longer is the inquiry a blended one, which looks to the past and present reality of the local political landscape. It is now a selective inquiry into the present. I cannot join this restructuring of the section 2 inquiry.
B. The Weight of the State of Texas’ Interest in Maintaining the Current Electoral System
Nor can I join the majority in its conclusion that the State of Texas’ interest in maintaining its current system — specifically, its interest in linking electoral base to “primary jurisdiction” — is substantial enough to outweigh the Plaintiffs’ proof of vote dilution. This interest is little more than tenuous and could not outweigh even weak evidence of vote dilution.
The majority argues that Texas links the primary jurisdiction of its district courts with their electoral base in order to preserve the values of independence and accountability. This so-called linkage interest, we are told, is substantial, because it represents the State of Texas’ decision about what constitutes a state district judge. According to the majority, by linking district judges’ electoral base with their area of primary jurisdiction, the State of Texas has made a decision similar to the State of Missouri’s decision in Gregory v. Ashcroft, — U.S. -, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), to have age qualifications for its judges.
Assuming arguendo that we are supposed to weigh non-tenuous state interests against proven vote dilution,[21] there are several flaws in the majority’s analysis of the strength of Texas’ linkage interest. First, I remain unconvinced that Texas insists on linking “primary jurisdiction” with electoral base. Also, there is a serious question as to whether this linking of primary jurisdiction with electoral base actually promotes the values of independence and accountability. Finally, Texas’ linkage interest can be equally served by other means, means that would not dilute minority voting strength. Once these analytical flaws are exposed, it becomes clear that Texas’ decision to link electoral base with primary jurisdiction is not at all comparable to Missouri’s decision in Gregory to have age limits for its trial judges.
1. Questioning Texas’ Insistence on Linkage
The majority concludes that the State of Texas does in fact link the primary jurisdiction of state district court judges with their electoral base. In doing so, it ignores that the concept of “primary jurisdiction” is found nowhere in Texas law. It also ignores that any historical insistence on “linkage” has been seriously undermined in recent years— and in recent weeks.
As discussed in my earlier opinion, state district judges in Texas do not have “primary jurisdiction” that is co-extensive with a county. See LULAC III, 986 F.2d at 767; see also McDuff, supra note 21, at 956-57. They may have primary venue responsibility that coincides with county lines, but a state district judge has state-wide jurisdiction. See Tex. Const, art. V, § 8. For example, a state district judge elected only by the voters of *919 Travis County has the power to declare unconstitutional the entire state’s method of financing public schools. See Edgewood Indep. Sch. Dist. v. Kirby, 777 S.W.2d 391 (Tex.1989) (affirming trial court’s decision). Thus, it is misleading for the majority to insist that Texas links the “primary jurisdiction” of district court judges with their electoral base. Indeed, the very opposite is the case: a Texas district judge’s jurisdiction extends far beyond his or her electoral base. The majority is saying no more than that Texas’ electoral districts, which are no smaller than a county, usually coincide with the venue unit under Texas law, which is also the county.
Moreover, Texas does not insist that its district judges be elected from an area no smaller than a county. Since 1985, the Texas Constitution has specifically authorized the voters of a county to decide to elect their district judges from an area smaller than a county. See Tex. Const, art. V, §§ 7, 7a. Texas also makes extensive use of visiting and retired judges, thus indicating its willingness to use judges who either were not elected at all or whose electoral base is not at all linked to some amorphous concept of “primary jurisdiction.” See LULAC III, 986 F.2d at 768. Also relevant in this regard is the State of Texas’ willingness to settle this lawsuit, which is discussed more fully in Part II infra. The Governor, the Attorney General, and the elected representatives of the people of the state have all expressed approval of a settlement calling for the election of district judges from areas that are smaller than a county. These recent events undoubtedly call into question the State of Texas’ insistence on linkage.
2. Questioning the Value of Linkage
Even if the State of Texas did consistently link a district judge’s electoral base with venue, there is a serious question as to whether such insistence on linkage would in fact advance Texas’ interests in judicial accountability and independence. The reality is that Texas’s venue rules do not, and were not meant to, ensure the accountability of judges. Moreover, there are flaws in the assumptions underlying majority’s assertion that linkage serves to advance the independence and fairness of district judges.
I do not see, and the majority does not explain, how linking electoral base with venue advances the State of Texas’ interest in judicial accountability. If linkage did advance such an interest, one might expect the state’s venue rules to reflect this purpose. As previously noted, however,
The Texas venue rules have not been drafted to insure that parties appear before judges for whom they have had an opportunity to vote. Instead, the venue rules for lawsuits involving living persons ... “were, in the main, manifestly adopted to prevent serious inconveniences and probable injury to defendants____” Snyder v. Pitts, 150 Tex. 407, 241 S.W.2d 136, 142 (1951).
LULAC III, 986 F.2d at 768. Moreover, given the unusually large size of the election districts in several of the counties at issue in this case, it strains credibility to maintain that linkage advances the state’s interest in judicial accountability. As several of the defense witnesses at trial testified, most people have no idea of who they are voting for in district court elections. These observations suggest that linkage in the large counties at issue in this case, rather than advancing the value of judicial accountability, actually detracts from it. See also H.J. of Tex, 73d Leg., R.S. 479, 482 (1993) (Address of Chief Justice • Thomas R. Phillips) (arguing that retention elections should be used to enhance the accountability of judges and suggesting that, under the current system, “the people have no meaningful vote”).
As for the State of Texas’ interest in judicial independence, linkage advances it, if at all, only marginally. What ensures judicial independence are the integrity of individual judges and the Texas Code of Judicial Conduct, which directs judges not to be swayed “by partisan interests, public clamor, or fear of criticism.” Tex. Code of Judicial Conduct, Canon 3, pt. A(l). The argument that linkage advances the State of Texas’ interest in judicial independence is, at bottom, a smokescreen: It suggests that district judges who are currently elected by white majorities, often with the substantial support of *920 plaintiffs’ lawyers, defense lawyers, or some other interest group, are responsive to the needs of all voters in the county — including minority voters. Yet it assumes that a judge elected from a majority-minority district would somehow be less willing to follow his or her oath or to be responsive to the needs of all. There is absolutely no evidence in the record to support such an assumption. See also McDuff, supra note 21, at 949 (“Of course, absolutely no reason exists to believe that black judges elected from majority black districts or Hispanic judges elected from majority Hispanic districts will be any more ‘partisan advocates’ than the white judges presently elected from majority white districts.”).
3. The Existence of Less Intrusive Means
Finally, Texas’ linkage interest is weakened by the existence of less intrusive means. I am referring specifically to the possible use of limited or cumulative voting. Both of these methods of election would preserve the link, to the extent there is any, between a district judge’s electoral base and his or her area of primary venue responsibility. It would also serve, at least to the same extent as the current method of electing judges, Texas’ interests in having accountable and independent judges.
The majority’s refuses to consider cumulative and limited voting as a less intrusive means. It argues that, because “[ljimited and cumulative voting are election mechanisms that preserve at-large elections,” they “are not ‘remedies’ for the particular structural problem that the plaintiffs have chosen to attack.” Majority Opinion at 876. Thus, the majority decides, “[w]e will not discount [the state’s] interest based upon purported remedies that preserve the challenged at-large scheme.” Id.
The majority misses the point. The Plaintiffs in this case allege that Texas’ current method of electing district judges in countywide elections dilutes their voting strength. Contrary to the majority’s hypertechnical argument, cumulative or limited voting would remove the dilutive aspect of the current at-large system, which is what the Plaintiffs are challenging. That it would also preserve county-wide elections merely serves to demonstrate that it is a less intrusive means for advancing Texas’ asserted interests. The majority’s refusal to consider these other means, in determining the weight of the state’s interests, is indefensible.[22]
4. The Nature of Texas’ Linkage Interest
Contrary to the majority’s assertions, Texas’ interest in linking the electoral base of its judges with venue is not a decision about what constitutes a state district court judge; indeed, it is nothing more than a decision about how to elect district court judges. The state’s insistence on linking the electoral base of district judges with them area of primary venue responsibility has, in recent years and recent weeks, almost evaporated, and there are serious doubts as to whether linkage in fact advances the values of judicial accountability and independence. Further, there are other means to preserve the so-called linkage interest. Unlike the majority, then, I cannot say that the State of Texas’ interest in linkage — which is simply a shorthand way of referring to its interest in maintaining the status quo — is anything like Missouri’s decision in Gregory about the qualifications of a state judge.
I would therefore hold that the state’s interest in linking the electoral base of its judges with their primary venue responsibility, allegedly to foster judicial independence and accountability, is little more than tenuous. At best, the argument is about appearances. At worst, it exhibits an unfounded fear of having judges elected from majority-minority districts. In any event, the majority’s conclusion that this interest is substantial is not founded in the record, in Texas *921 law, or in reality. It could not outweigh the evidence of vote dilution in this case even if that evidence were only weak, which it manifestly is not.
II. THE MOTION TO REMAND
Given the majority’s misguided and destructive efforts on the merits of this case, one might reasonably ask why the Plaintiffs and the State of Texas, acting through its Attorney General, were not given the opportunity to settle this dispute. The majority offers three reasons: First, the majority suggests that the motion to remand should be denied because the Texas Attorney General is somehow acting beyond the scope of his authority. The majority also makes a related argument that the motion must be denied because not all of the “defendants” have consented to the remand or to the proposed settlement. Finally, the majority declines to remand for a hearing on the proposed settlement on the ground that the settlement is inconsistent with state law.
As explained below, none of the reasons proffered by the majority precludes a remand for purposes of conducting a settlement hearing. That is, the majority could have easily remanded this case, but chose not to because it wanted to reach the merits of this case and overhaul the Voting Rights Act. I cannot embrace such reasoning.
A. Does the Attorney General Have the Authority to Settle this Lawsuit?
In suggesting that the Texas Attorney General is acting beyond the scope of his authority by agreeing to the proposed settlement and requesting a remand, the majority misperceives the nature of the Attorney General’s status in this lawsuit. That is, the majority treats the Attorney General as just another lawyer who is representing the various officials named as defendants. The Attorney General, however, is not just another lawyer; he is also a named defendant, as well as the chief legal officer for the State of Texas in this litigation. As such, he had the power under Texas law to negotiate and execute the proposed settlement and to request a remand of this case.
1. The Nature of this Lawsuit
The majority correctly notes that the Plaintiffs in this case filed suit against the Attorney General of Texas, the Texas Secretary of State, and the members of the Texas Judicial Districts Board (including the Board’s chairman, Chief Justice Phillips). These defendants were not named in their individual capacities, but only in their official capacities. The Plaintiffs were apparently required to do this under the Supreme Court’s Eleventh Amendment jurisprudence — specifically, under the fiction of Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which holds that a suit for declaratory and injunctive relief against state officers does not constitute a suit against the state for Eleventh Amendment immunity purposes.[23]
Jurisdictional fictions notwithstanding, I would hold that, at least for purposes of *922 determining whether this case should be remanded, this is a suit against the State of Texas itself. Indeed, in one of our previous opinions, we recognized that the Plaintiffs sued “Texas through its officials.” League of United Latin American Citizens, Council No. 4434 v. Clements, 923 F.2d 365, 367 (5th Cir.1991) (Gee, J.) (en banc); see also id. (again recognizing that the “defendant” in this case is “the state”). Given the fact that section 2 only prohibits a “State or political subdivision” from employing certain voting practices and procedures, see 42 U.S.C. § 1973(a), our recognition that this lawsuit was in all aspects (other than for Eleventh Amendment purposes) filed against the State of Texas was entirely warranted. See also League of United Latin American Citizens, Council No. 4434 v. Clements, 884 F.2d 185, 189 (5th Cir.1989) (“A voting rights case challenges the election process rather than the individuals holding offices.”) (emphasis added).
This case is not, therefore, like Public Utility Comm’n of Texas v. Cofer, 754 S.W.2d 121 (Tex.1988), where the Attorney General’s clients — two state agencies which he was obligated to represent under separate statutes[24] — were on opposing sides of litigation in state court. Thus, it is not a case where we must be concerned with possible conflicts of interest. See id. at 125. Rather, this is a case in which certain officials were named as “jurisdictional parties.” See Bullock v. Texas Skating Ass’n, 583 S.W.2d 888, 894 (Tex.Civ.App. — Austin 1979, writ refd n.r.e.). In short, I think that the Attorney General’s client in this case is the State of Texas — not the various officials who were joined solely for Eleventh Amendment purposes.
2. The Attorney General’s Power to Represent the State
Once it is recognized that the State of Texas and its election process are the real targets of the Plaintiffs’ lawsuit, the question then becomes: Who is authorized to represent state and protect its interests? The answer is supplied by state law. Cf. New York v. Uplinger, 467 U.S. 246, 248, 104 S.Ct. 2332, 2332, 81 L.Ed.2d 201 (1984) (“The allocation of authority among state officers to represent the State before this Court is, of course, wholly a matter of state concern.”).
The State of Texas, through constitutional and statutory law, has appointed the Attorney General to represent its interests in litigation such as this.[25] The Texas Constitution specifically provides that the Attorney General “shall represent the State in all suits *923 and pleas in the Supreme Court of the State in which the State may be a party.” Tex. Const, art. IV, § 22. The interpretative commentary to this provision notes that the “attorney general is the chief law officer of the state” and has the responsibility of “representing the state in civil litigation.” Id., interp. commentary (emphasis added). The Texas Government Code is similarly explicit in naming the Attorney General to speak for the state. It provides: “The attorney general shall prosecute and defend all actions in which the state is interested before the supreme court and courts of appeals.” Tex. Gov’t Code Ann. § 402.021 (Vernon 1990).
Contrary to the majority’s assertions, the Texas Attorney General is not just another lawyer. Unlike an ordinary lawyer he is entitled and obligated by law to represent his client, the state. The Texas Supreme Court recognized as much in Maud v. Terrell, 109 Tex. 97, 200 S.W. 375, 376 (1918), when it explained:
[T]he powers thus conferred by the Constitution upon [the Attorney General and the county and district attorneys] are exclusive. The Legislature cannot devolve them upon others. Nor can it interfere with the right to exercise them. It may provide assistance for the proper discharge by these officials of their duties, but since in the matter of prosecuting the pleas of the State in the courts the powers reposed in them are exclusive in their nature, it cannot, for the performance of that function, obtrude other persons upon them and compel the acceptance of their services. Wherever provision is made for the servie-es of other persons for that express purpose, it is the constitutional right of the Attorney-General and the county and district attorneys to decline them or not at their discretion, and, if availed of, the services are to be rendered in subordination to their authority.
(internal citations omitted); see also Hill v. Texas Water Quality Board, 568 S.W.2d 738, 741 (Tex.Civ.App. — Austin 1978, writ refd n.r.e.) (“[E]ither the Attorney General or a county or district attorney may represent the State in a particular situation, but these are the only choices^] whichever official represents the State exercises exclusive authority and if services of other lawyers are utilized they must be ‘in subordination’ to his authority.”). Moreover, the Texas Attorney General has broad discretion to control litigation strategy where he is representing the state. Indeed, in Charles Scribner’s Sons v. Marrs, 114 Tex. 11, 262 S.W. 722, 727 (1924), the Texas Supreme Court stated that, “[e]ven in the matter of bringing suits, the Attorney General must exercise judgment and discretion, which will not be controlled by other authorities.” See also Bullock v. Texas Skating Ass’n, 583 S.W.2d at 894.
Despite this language from the highest court in Texas, the majority insists that the Attorney General is not the exclusive representative of the State of Texas in matters of litigation. The majority curiously finds compelling Chief Justice Phillips’ argument that, as Chairman of the Judicial Districts Board, “he has the authority to defend this lawsuit if the Attorney General will not.” Majority Opinion at 841.[26] In support of this finding, *924 the majority relies heavily on our en banc decision in Baker v. Wade, 769 F.2d 289 (5th Cir.1985) (en banc), cert. denied, 478 U.S. 1022, 106 S.Ct. 3338, 92 L.Ed.2d 742 (1986), where we permitted a state district attorney to represent the State of Texas’ interests on appeal after the Attorney General declined to do so.
The majority’s reliance on Baker is wholly misplaced. In allowing a state district attorney to intervene on appeal and defend the constitutionality of Texas’ sodomy statute, Judge Reavley emphasized the narrowness of the decision. Among other things, he noted that, “as of the date of the entry of the district court’s judgment, [the state district attorney] was a member of the [defendant] class, was enjoined by that judgment, and as district attorney was a proper official under Texas law to represent the state.” Id. at 291 (emphasis added) (citing Tex. Const, art. V, § 21). In this case, by contrast, Chief Justice Phillips is not a proper official under Texas law to represent the state. Indeed, the majority has pointed to no provision of Texas law, and I can find none, that would even arguably allow the members of the Texas Judicial Districts board to represent the interests of the state in litigation.
Thus, our decision in Baker is consistent with Texas law, which provides that “either the Attorney General or a county or district attorney may represent the State in a particular situation.” See Hill v. Texas Water Quality Board, 568 S.W.2d at 741. The majority opinion, on the other hand, ignores Texas law when it refuses to recognize that “these are the only choices.” Id. Unlike the majority, then, I would hold that the Attorney General has the exclusive authority to represent the interests of the state in this litigation.
3. The Attorney General’s Power to Settle on Behalf of the State
The majority’s failure to perceive the nature of this lawsuit, as well as its failure to understand the broad and exclusive powers of the Texas Attorney General, ultimately leads it to suggest that the Attorney General in this case has acted beyond his authority in approving the settlement and asking for a remand. I reject this suggestion.
In Terrazas v. Ramirez, 829 S.W.2d 712 (Tex.1991), seven of nine members of the Texas Supreme Court rejected a similar argument. In particular, they rejected an argument that the Attorney General lacked the power to negotiate and execute a settlement agreement on behalf of the state. A plurality of the court, consisting of Justice Heeht, Chief Justice Phillips, and Justice Cook, reasoned as follows:
The Attorney General, as the chief legal officer of the State, has broad discretionary power in conducting his legal duty and responsibility to represent the State. This discretion includes the authority to propose a settlement agreement in an action attacking the constitutionality of a reapportionment statute. The Attorney General has participated in such settlements on previous occasions. Although the Attorney General appears to have acted throughout this litigation only on behalf of the state defendants and not for himself, he had the authority, certainly for his clients and even on his own, to suggest possible remedies after the district court rendered an interlocutory summary judgment holding Senate Bill 31 unconstitutional. He also had the power to negotiate a settlement with the plaintiffs and to execute an agreement with them. To hold that he did not would be to give him less authority than any party or any other attorney participating in the case.
Id. at 721-22 (internal citations omitted) (emphasis added). Justice Hightower and Justice Gammage, dissenting on other grounds, recognized that the “Attorney General, in carrying out his constitutional responsibility to represent the interests of the state, has discretionary power to settle lawsuits on behalf of the state so long as he does not usurp the authority of a co-equal department of government.” Id. at 753 (Hightower, J., joined by Gammage, J., dissenting). In a separate dissent, Justice Mauzy and Justice Doggett made similar statements about the Attorney General’s power to settle lawsuits. See id. at 746-47 (Mauzy, J., joined by Dog-gett, J., dissenting). Thus, as Justice Mauzy *925 correctly noted, seven justices agreed that “[tjhe [AJttorney [Gjeneral is constitutionally empowered to execute a settlement agreement in litigation challenging a legislative redistricting plan.” Id. at 747.
Consistently with the Texas Supreme Court’s disposition in Terrazas, I would hold that the Texas Attorney General acted within his power as the chief legal officer of the state by executing the proposed settlement and, thereafter, by requesting a remand. This lawsuit is, for all practical purposes, a suit against the State of Texas, and the decisions by the Attorney General in this regard are quintessential decisions about how to protect the state’s interests in litigation— decisions which, under Texas law, he is constitutionally empowered to make on behalf of the state.[27]
B. Who Must Consent to the Settlement?
The majority also offers a second ground for refusing to remand the case for a hearing on the proposed settlement: that not all of the “defendants” have consented to the remand or to the settlement. In particular, the majority argues that, because the two intervening district judges, Judge Wood and Judge Entz, as well as Chief Justice Phillips, object to the settlement, the settlement could not be approved and therefore the ease should not be remanded. Again, I disagree. In my view, by obtaining the consent of the Texas legislature, the Texas Attorney General did as much as (or perhaps more than) he was required to do under Texas law.
1. Not the Intervening Judges
Judge Wood and Judge Entz’s objections to the settlement do not preclude a remand. The Supreme Court’s decision in Local Number 93, International Ass’n of Firefighters v. City of Cleveland, 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986), could not be clearer on this point. There, the court held that a union, who intervened as a matter of right, could not block the entry of a consent decree merely by withholding its consent to the settlement. The Court stated:
It has never been supposed that one party — whether an original party, a party that was joined later, or an intervenor — could preclude other parties from settling their own disputes and thereby withdrawing from litigation. Thus, while an intervenor is entitled to present evidence and have its objections heard at the hearing on whether to approve a consent decree, it does not have power to block the decree merely by withholding its consent.
Id. at 528-29, 106 S.Ct. at 3079.
Admittedly, a court may not enter a consent decree which has the effect of disposing “of the valid claims of noneonsenting interve-nors.” Id. at 529, 106 S.Ct. at 3079. Nor may a court “enter a consent decree that imposes obligations on a party that did not consent to the decree.” Id. But these concerns are not implicated by the settlement proposed in this case. ■
The proposed settlement agreement in this case does not dispose of the “valid claims” of Judge Wood and Judge Entz. They are only permissive intervenors. See New Orleans *926 Public Serv., Inc. v. United Gas Pipe Line Co., 732 F.2d 452, 463 (5th Cir.), cert. denied, 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984); see also Clements v. League of United Latin American Citizens, 884 F.2d at 187 (equating intervenor of right with “real party in interest”). As such, they do not have the status of an original party.[28] Moreover, as I read the record, they were permitted to intervene only to protect their tenure as sitting elected judges.[29] Thus, although I agree with the majority that the intervening judges do not, at this time, have to independently satisfy article III standing requirements,[30] their mere status in this lawsuit as permissive intervenors does not, in my view, serve to give them “claims” or “defenses” in the sense contemplated by Firefighters.
*927 Nor does the proposed settlement place any “obligations” on Judge Wood or Judge Entz. On the contrary, the settlement has absolutely no effect on either the tenure of these judges or the manner in which they will be elected in the future. In addition, they are not directed to do anything under, the proposed settlement. Compare Chisom v. Roemer, 970 F.2d 1408 (where settlement at issue required the Louisiana Supreme Court to temporarily assign judge elected to newly created court of appeals position to the Supreme Court), appeal dismissed by, 975 F.2d 1092 (5th Cir.1992).
Unlike the majority, therefore, I do not think that the intervening judges have to power to block the motion to remand or the entry of the proposed settlement in this case. As permissive intervenors, they have no “claims” or “defenses” that are adjudicated by the proposed settlement. And even a cursory reading of the proposed settlement reveals that it does not impose obligations or duties on the intervening judges. Thus, under Firefighters, their withholding of consent to the motion to remand is simply irrelevant.
2. Not Chief Justice Phillips
I would also hold that Chief Justice Phillips’ objections to this particular settlement do not preclude a remand. As explained earlier, I do not view this lawsuit as being one against the various named officials, but rather, as one against the State of Texas. And because the Attorney General is the exclusive representative of the state in such matters, the consent of Chief Justice Phillips is not required.
The Austin appellate court’s decision in Bullock v. Texas Skating Ass’n, which was cited with approval by the plurality opinion in Terrazas, is particularly instructive. In this tax refund case, the plaintiff, who had prevailed in the lower court, argued that the Attorney General’s notice of appeal should be dismissed because one of the Attorney General’s “clients” — namely, the Comptroller— had instructed the Attorney General not to file' a notice of appeal from the adverse decision. In denying the plaintiffs motion as meritless, the Bullock court first described the status of the various named defendants. It stated, “The Attorney General is a defendant in suits of this type in the same manner that the Comptroller and the Treasurer are jurisdictional parties, although the State of Texas is the actual party in [a] suit to recover taxes.” 583 S.W.2d at 894. The' court then rejected the plaintiffs argument that “the Comptroller, in the exercise of his administrative duties, such as tax refunds, can bring litigation to a halt at any time.” Id. It explained:
In this suit the Comptroller obviously exercised his administrative discretion and rejected [the plaintiffs] request for refund of taxes paid under protest; otherwise there would have been no litigation. Thereafter, upon filing of suit, the Comptroller’s statutory powers ended. In matters of litigation the Attorney General is the officer authorized by law to protect the interests of the State, and even in matters of bringing suit the Attorney General must exercise judgment and discretion, which will not be controlled by other authorities. It was within the discretion of the Attorney General, not that of the Comptroller, to decide whether to appeal a case in which the State had experienced an adverse judgment in the trial court. In such matters the Attorney General, not the Comptroller of Public Accounts, is authorized to perform the duties of the State’s attorney. The motion to dismiss the appeal is overruled.
Id. (internal citations and quotation marks omitted).
Like the majority, I think that the decision to settle a lawsuit is, for all practical purposes, indistinguishable from the decision to file (or not to file) a notice of appeal. Unlike the majority, however, I also think that the Attorney General’s decision on these issues controls — at least when it does not conflict with the view of another appropriate representative of the state. See supra Part II.A.2 (discussing Baker v. Wade). Thus, I do not think that Chief Justice Phillips, who is at most a “jurisdictional party,”[31] must consent *928 to a remand before the motion to remand is granted.[32]
3. Perhaps the Texas Legislature
In concluding that neither the consent of the intervening judges nor the consent of Chief Justice Phillips is required, I am not unmindful of the potential for state law separation of powers problems in cases like these. See Terrazas, 829 S.W.2d at 720. Nor was the Attorney General unmindful of the potential for such problems in this case. This is why he sought and obtained approval of the proposed settlement from both houses of the Texas legislature.
The majority suggests that, because the Texas legislature could not enact the proposed settlement into law, its less formal approval of the proposed settlement is meaningless. I disagree. The Texas Senate, acting as a Committee of the Whole (which is authorized by Texas law), expressed its approval of the proposed settlement in the form of a resolution. The Texas House similarly approved the proposed settlement through a resolution. Both of these resolutions were “official” expressions of the Texas legislature’s position on the question of whether this case should be settled.
In my view, these resolutions only reinforce the conclusion that the State of Texas has consented to a remand and to entry of the proposed settlement. That two intervening judges and Chief Justice Phillips, none of whom was elected to represent the state in matters of litigation, do not consent, only serves to highlight the extent to which this lawsuit has become politicized. Their failure to consent does not, however, preclude a remand or the entry of a settlement agreement.
C. Can the Proposed Settlement Override State Law?
Finally, the majority declines to remand this case because the proposed settlement is inconsistent with state law — specifically, the provision of the Texas Constitution that allows judicial districts to be drawn smaller than a county, but only with the approval of the voters of the county. See Tex. Const. art. V, § 7a(i). The majority holds that, without a final, non-appealable decision finding a section 2 violation, voting rights cases cannot be settled in a way that is inconsistent with state law. Once again, I must disagree.
The majority argues that in Chisom v. Roemer, 970 F.2d 1408, 1409 (5th Cir.1992), where we remanded a case similar to this, we were able to remand because the parties brought with them a duly enacted state law. Even assuming that the settlement proposed in Chisom was entirely consistent with state law — a matter upon which we expressed no opinion[33] — there is a crucial distinction be *929 tween this case and Chisom: in Chisom, the district court had found no section 2 liability; in this case, by contrast, the. district court found that the Texas’ method of electing district court judges in county-wide elections violated section 2 in each of the nine target counties.
I think the district court’s section 2 liability findings provide a sufficient basis for remanding the case for a hearing on the proposed settlement. Of course, I agree with the majority that the district court would not be able to “merely sign on the line provided by the parties.” See United States v. City of Miami Florida, 664 F.2d 435 (Former 5th Cir.1981) (en banc). Given the detailed section 2 findings already made by the district court, however, I do not think that the settlement’s apparent inconsistency with state law is a reason to deny the motion to remand.
Our decision in Overton v. City of Austin, 748 F.2d 941 (5th Cir.1984), rather than arguing against a remand, suggests that a remand may be particularly appropriate in this case. There, we refused to mandamus a district court to enter a proposed consent decree based on a settlement between minority plaintiffs and the City of Austin. We noted that, at the time the settlement was presented for approval, no evidence of vote dilution had been presented to the district court. In holding that the district court did not abuse its wide discretion in refusing to enter the consent decree, we concluded that the parties were effectively trying to accomplish a result — namely, the amending of Austin’s City Charter — which they did not have the power to do without a vote of the people. We stated:
Thus, more is necessarily involved than merely ascertaining whether the parties have consented to an ultimate result which is not of itself illegal, unreasonable or unfair. Absent a properly grounded judicial determination that the present charter provisions are illegal, the consent of the parties provides an insufficient basis on which to judicially ordain a different system of council election and composition.
748 F.2d at 956-57 (emphasis added).[34]
When the parties in this case presented their motion to remand, the case was in a very different posture than the one in Over-ton. There had been lengthy trial, during which time the Plaintiffs presented substantial evidence of vote dilution. Moreover, the only decision which still stood was the district court’s — i.e., the one holding that Texas’ method of electing district judges in at-large, county-wide elections operates in the nine target counties to dilute minority voting strength. In my view, this decision constitutes a “properly grounded judicial determination” that the current system is illegal. It was based on the evidence presented at trial and represents a reasonable interpretation of that evidence. This finding should be sufficient under Overton to allow the parties to effectuate a settlement they otherwise would not have the authority to bring about under state law.
Also, because this settlement has been approved by a majority of both houses of the Texas legislature, I think that the motion to *930 remand should be taken more seriously than the majority sees fit to do. In confronting an analogous situation in Wise v. Lipscomb, 437 U.S. 535, 548, 98 S.Ct. 2493, 2501, 57 L.Ed.2d 411 (1978), the Supreme Court approved the decision of the Dallas City Council to reapportion itself in response to a district court finding that the then-existing at-large election system violated the Constitution — despite the fact that the city council appeared to lack the power to do so under state law. In a concurring opinion, four Justices explained why a federal court was required to show deference to the plan:
The essential point is that the Dallas City Council exercised a legislative judgment, reflecting the policy choices of the elected representatives of the people, rather than the remedial directive of a federal court____ This rule of deference to local legislative judgments remains in force even if ... our examination of state law suggests that the local body lacks the authority to reapportion itself.
Id. at 548, 98 S.Ct. at 2501. (Powell, J., concurring, joined by Burger, C.J., Black-mun, and Rehnquist, JJ.). Although the resolutions passed by the Texas legislature in this ease do not have the force of law, they do represent an official expression of the “elected representatives of the people” of Texas on the questions of whether and how this case should be settled.
Ultimately, the majority is able to rely on the settlement’s apparent inconsistency with state law as a ground to deny the motion to remand because it is convinced “there is no [section 2] case” here. Even a cursory review of the record in this case discounts the majority’s characterization of the Plaintiffs’ evidence of vote dilution. See generally supra Part I. But the majority’s statement does reveal something about its real motivation for denying the motion to remand: its unwavering desire to reach the merits of this case so that it can overhaul the Voting Rights Act.
D. The Implications of the Majority’s Decision to Deny the Motion to Remand
In sum, the majority offers three reasons why the motion to remand filed by the State of Texas and the Plaintiffs in this case must be denied. None is persuasive. The majority cannot seriously argue that the Attorney General has exceeded his authority or that he has somehow failed in his duty to represent the interests of the State of Texas. And, although the majority correctly notes that not all of the nominal “defendants” have joined in the motion to remand, it offers no reason why the case cannot be remanded without the consent of the intervening judges and Chief Justice Phillips. Finally, the majority is able to rely on the fact that the proposed settlement is inconsistent with Texas law only by reaching the merits of the underlying section 2 dispute — and reversing the district court on clearly erroneous grounds.
The majority’s rationale for denying the motion to remand will discourage, if not prohibit, the settling of most voting rights cases. It will effectively require the consent of all of the various named officials, as well as any party who, for whatever reason, has been permitted to intervene. And, in most eases, it will require a final, non-appealable decision that there is a section 2 violation. That is, under the majority’s reasoning, a state may effectively be forced to defend an election system, even when its chief legal officer thinks that the system runs afoul of the Voting Rights Act, unless there is a conclusive determination by the Supreme Court that the system does indeed violate section 2. Somehow, I do not think this is consistent with our policy of encouraging settlements in other areas of the law.
Moreover, the majority’s rationale for denying the motion to remand places a premium on judicial efficiency. The majority concludes that, based upon the evidence the Plaintiffs’ adduced at trial, no reasonable district court could enter a consent decree that would override provisions of Texas law. Of course, in making this conclusion, the majority necessarily tramples upon other judicial values that are equally, if not more, important — namely, the values of judicial restraint and federalism. It also turns a deaf ear to the one voice in this lawsuit who is authorized to speak on behalf of the State of Texas, the Attorney General, and ignores the *931 Texas legislature’s official expression of its desire to see this ease settled.
Instead of elevating judicial efficiency above these other values, I would grant the motion to remand. In doing so, I would express no opinion on the proposed settlement, but would instruct the district court that it should carefully consider the objections of the intervening judges, Chief Justice Phillips, and other interested parties. I would also instruct the district court that, in deciding whether a settlement can override state law, it must consider all evidence relevant to the question of whether there is a section 2 violation, including the state’s valid interests in maintaining the current system.
Admittedly, this course of action might eliminate our opportunity to address many of the new, burning questions about the framework for deciding section 2 cases. But that is not the duty of an Article III court. Rather, as the majority notes, “[o]ur job is to decide a case or controversy.” Majority Opinion at 847. Where the plaintiffs and the defendant in a case have expressed a desire to settle their dispute, I think that principles of judicial restraint require us to give them the opportunity to do so.

. The panel majority opinion contains a fuller discussion of many of the issues addressed in this dissent. I have tried to avoid an overly long dissent in the hopé that the reader will refer to the earlier opinion for a more complete treatment of the issues.

. In reversing the district court’s findings of legally significant white bloc voting in the various counties, the majority relies on trivariate regression analyses submitted by the State of Texas and Judge Wood in this case — analyses which unquestionably demonstrated that a candidate's partisan affiliation was a better predictor of electoral success than a candidate’s race. The majority does not remand this case to the district court for consideration of the statistics under the new legal standards for racial bloc voting — as might be expected under Pullman-Standard v. Swint, 456 U.S. 273, 292, 102 S.Ct. 1781, 1792, 72 L.Ed.2d 66 (1982) (where district court’s factual finding is based upon a misapprehension of law, "a remand is the proper course unless the record permits only one resolution of the factual issue”). Rather, the majority concludes that the *904 voting statistics in this case are capable of only one interpretation — an interpretation that is severely flawed. See infra Part I.A.1.b(ii).

. The majority suggests that evidence that racially divergent voting patterns are attributable to partisan affiliation or perceived interests is "quite probative” on the question of whether white bloc voting will consistently defeat minority-preferred candidates. Majority Opinion at 858 n. 26. I strongly disagree. If the "perceived interests” of minority voters lead them to vote for candidates of one political party, while the interests of a majority of whites lead them to vote for candidates of a different party, this would seem to strengthen, not weaken, the consistency with which the two racial groups would vote differently. That election results appear to be attributable to voting along party lines, then, does not suggest that other candidates, "equally preferred by the minority group, might be able to attract greater white support in future elections.” In short, it does nothing to undercut — and may even strengthen — the consistency with which minority-preferred candidates are defeated.

. The Department of Justice (DOJ) argues persuasively in its en banc brief that the real issue in Whitcomb was not whether blacks in Marion County generally were denied an opportunity to elect their chosen candidates, but whether ghetto blacks were being denied such an opportunity. DOJ points specifically to evidence suggesting that "black voters in a middle-class black area were able to elect candidates from their area even when Republicans were winning generally." See Whitcomb, 403 U.S. at 133, 150 n. 29, 91 S.Ct. at 1863, 1872 n. 29 (noting that census tract 220, inhabited predominantly by middle class blacks, elected one senator and five representatives). The ghetto area had similar success. During the same time period, it elected one senator and four representatives. Id. at 150 n. 29, 91 S.Ct. at 1872 n. 29.

. The State of Texas’ expert in this case conceded that his intent in conducting a trivariate regression analysis "was not to find out the precise reasons why a candidate won or lost.” He further stated that, if he "had tried to get involved in campaign expenditures and incumbency, ratings by the Bar Association, it would be an impossible task to do.” See LULAC III, 986 F.2d at 805.

. Professor Bernard Grofman, of the University of California at Irvine, has recently commented on the pitfalls of drawing conclusions about causation from multivariate analyses of voting patterns. In an article appearing in Social Science Quarterly, Professor Grofman laments that "[f]undamental flaws exist in most multivariate approaches to bloc voting analysis used to date.” Bernard Grofman, Multivariate Methods & the Analysis of Racially Polarized Voting: Pitfalls in the Use of Social Science by the Courts, 72 Soc. Sci.Q. 826, 828 (1991). Professor Grofman specifically criticizes the methodology used by the defendants’ expert in McCord v. City of Fort Lauderdale, 787 F.2d 1528, vacated, 804 F.2d 611 (11th Cir.1986). This expert testified that, because the race of the candidate was not significant in explaining election outcomes beyond what could be accounted for by other variables (such as incumbency, campaign expenditures, newspaper endorsements, voter turnout, and the sex of the candidate), race was not really a factor in accounting for voting patterns. See 787 F.2d at 1532. According to Professor Grofman, the expert's interpretation of the voting statistics was "simply wrong,” because, among other things, "there are so many other variables collinear with race used that they almost certainly will reduce [the] significance of race in a multivariate regression.” Grofman, supra, at 830. Ultimately, Professor Grofman concludes:
[A]s used so far by expert witnesses for defendants in voting rights cases, multivariate regression methods have produced misleading results about the levels of or existence of racial bloc voting patterns, and have served mainly to misuse statistics and confuse courts.
Id. at 832.

. But see Kirksey v. City of Jackson, 663 F.2d 659, 662 (5th Cir. Unit A Dec. 1981) (holding that, because of First Amendment concerns, voters’ motivations are not subject to searching scrutiny by plaintiffs in a voting rights case), clarified, 669 F.2d 316 (5th Cir.1982).

. In this regard, I note that the majority's position is much more strained and severe than the one taken by Chief Judge Tjoflat of the Eleventh Circuit. In Solomon v. Liberty County, 899 F.2d 1012 (11th Cir.1990) (evenly-divided en banc opinion), cert. denied, 498 U.S. 1023, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991), Chief Judge Tjoflat,. writing for four other judges, advocated a no racial bias affirmative defense under section 2. He reasoned:
I submit that section 2 prohibits those voting systems that have the effect of allowing a community motivated by racial bias to exclude a minority group from participation in the political process. Therefore, if a section 2 defendant can affirmatively show, under the totality of the circumstances, that the community is not motivated by racial bias in its voting, a case of vote dilution has not been made out.
Id. at 1022 (Tjoflat, C.J., joined by Fay, Edmon-son, Cox, and Hill, JJ., specially concurring). The section 2 framework, as he envisions it, would work in a manner analogous to the framework followed in Title VII cases. See United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If minority plaintiffs satisfy the Gingles threshold inquiry, a rebuttable presumption arises that the community is motivated by racial bias. See Solomon, 899 F.2d at 1035. If the defendant offers nothing in rebuttal, the minority plaintiffs win. However,
[i]f ... the defendant offers proof of other objective factors in rebuttal, the court must be satisfied, before it may rule in favor of the plaintiff[s], that, under the totality of the circumstances, the minority group is denied meaningful access to the political process “on account of race or color.” If the defendant can affirmatively show that the "social and historical conditions” are such that their interaction with the scheme will not result in voting discrimination, the plaintiff[s] cannot prevail. Such an affirmative showing can be made with evidence of objective factors that, under the totality of the circumstances, indicate that the voting community is not driven by racial bias.
Id. (internal citations omitted) (emphasis added).
Even Judge Tjoflat recognizes the concept of racial bloc voting does not contain any racial animus requirement. He notes:
I do not mean to imply that a defendant, by proving absence of racial bias, can rebut a plaintiff’s showing of racial bloc voting.... Such evidence, however, does not create an irrebuttable case of vote dilution — it is irrebuttable proof of only one factor (albeit an important factor) in the totality-of-the-circumstances test.
Id. at 1035 n. 12.

. The majority implies that interest group politics did not begin in Texas until the 1980’s, when the Republican Party emerged as a force to be reckoned with. The majority ignores that, even when Texas was a one party state, there were still different factions, or interest groups, within the Democratic party. Thus, partisan or interest group politics has always been a feature of Texas' colorful political landscape. To hold otherwise is to ignore the past reality. As noted previously, the evidence in this case reflects that, before 1980, minority-preferred candidates lost in Democratic primary elections, generally to white Democrats; after 1980, minority-preferred candidates may make it to the general election, but only to lose to white Republicans. See LULAC III, 986 F.2d at 812 n. 59. "From the vantage point of minority voters — which is the vantage point of section 2 — it is difficult to see how the arrival of a two party system in Texas has altered their ability to participate in the political process and elect candidates of their choice.” Id.

. In support of its assertion that partisan politics, not race, is responsible for the inability of blacks and Hispanics to participate in the political process and elect representatives of their choice, the majority notes that "white Democrats have in recent years experienced the same electoral defeats as minority voters.” Majority Opinion at 861. It then states:
If we are to hold that these losses at the polls, without more, give rise to racial vote dilution warranting special relief for minority voters, a principle by which we might justify withholding similar relief from white Democrats is not readily apparent.
Id. The simple answer to this concern about limiting the reach of section 2 is that, unlike the minorities in this case, whites are not politically cohesive. Thus, contrary to the majority’s assertions, white Democrats would be no more able to obtain relief under section 2 than would white Republicans.

. I therefore agree with Justice O’Connor’s position on the extent to which explanations for racially divergent voting patterns are relevant to the white bloc voting inquiry. In Gingles, she stated:
Evidence that a candidate preferred by the minority group in a particular election was rejected by white voters for reasons other than those which made that candidate the preferred choice of the minority group would seem clearly relevant in answering the question whether bloc voting by white voters will consistently defeat minority candidates. Such evidence would suggest that another candidate, equally preferred by the minority group, might be able to attract greater white support in future elections.
478 U.S. at 100, 106 S.Ct. at 2792 (emphasis added). As noted previously, see supra note 3, I read this passage as saying that evidence of partisan voting patterns that overlay racial bloc voting patterns would not call into question the consistent defeat of minority-preferred candidates.

. This evidence would also, therefore, be insufficient to establish a "no racial bias" affirmative defense, as advocated by Chief Judge Tjoflat of the Eleventh Circuit. See supra note 8.

. I am referring specifically to the majority’s decision to explore low black enrollment at Louisiana State University Law School. This "example” has about as much to do with this case as does George Wallace's decision to crown a black homecoming queen at halftime of a football game at the University of Alabama. See LULAC III, 986 F.2d at 819 (Higginbotham, J., dissenting).

. As the Houston Lawyers’ Association noted at oral argument, the Voting Rights Act is not about equal employment opportunities; it is about the equal opportunity of voters to participate in the political process and elect representatives of their choice. In this regard, it is interesting to note that the majority, in proclaiming that minorities are overrepresented on the district court bench, frequently considers, minority judges who were not minority-preferred candidates. In Dallas County, for example, the majority recites that five of the thirty-six district judges are black. What the majority does not say is that the two black judges who won partisan elections were not even the preferred candidates of the black community. The majority also ignores the fact that, at the time of trial in Dallas County, no black candidate with the support of the black community had ever won 'a contested election for district judge. See LULAC III, 986 F.2d at 785.

. For most of its history, Texas has maintained — at all levels — a racially discriminatory education system. See, e.g., Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950) (holding that the University of Texas Law School's racially discriminatory admittance policy violated the Equal Protection clause of the Fourteenth Amendment). This system of dual schools, which were undoubtedly separate and unequal, began to be remedied as early as 1960 in the Houston public school system. See Houston Indep. Sch. Dist. v. Ross, 282 F.2d 95 (5lh Cir.1960) (affirming district court order which required desegregation of schools to begin in September 1960); see also Flax v. Potts, 464 F.2d 865, 867 (5th Cir.) (noting that Fort Worth Independent School District had official policy of segregation until 1967), cert. denied, 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299 (1972). Other communities, however, began dismantling their dual school systems at a much later date. See United States v. CRUCIAL, 722 F.2d 1182 (5th Cir.1983) (affirming district court's finding that Ector County engaged in intentional segregation of black and Hispanic students, which extended into the 1981-82 school year); Graves v. Barnes, 378 F.Supp. 640, 648 (W.D.Tex.1974) (three-judge court) (finding that twenty years after the Supreme Court's decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Beaumont Independent School District continued to bus black children away from their neighborhood schools and across town to all-black schools), vacated sub. nom. White v. Regester, 422 U.S. 935, 95 S.Ct. 2670, 45 L.Ed.2d 662 (1975); id. at 654-55 (recognizing that authorities in Lubbock County maintained racially and ethnically segregated schools until the 1970’s). As a result of these desegregation efforts, many of the school districts that were under court supervision for some twenty years finally achieved unitary systems during the 1980’s. See, e.g., United States v. Texas Educ. Agency, 138 F.R.D. 503, 505 (N.D.Tex.1991) (noting that Lubbock Independent School District was declared to be a unitary system in May 1988), aff'd, 952 F.2d 399 (5th Cir.1991), cert. denied, — U.S. -, 112 S.Ct. 2992, 120 L.Ed.2d 869 (1992); Flax v. Potts, 725 F.Supp. 322, 330 (N.D.Tex.1989) (declaring Fort Worth Independent School District to be unitary), aff'd, 915 F.2d 155 (5th Cir.1990); Covington v. Beaumont Indep. Sch. Dist., 714 F.Supp. 1402, 1404 (E.D.Tex.1989) (noting that Beaumont Independent School District was declared unitary in 1984). The only notable exception in this regard is the Dallas public school system, which continues to be under court supervision. See Tasby v. Edwards, 807 F.Supp. 421 (N.D.Tex.1992)
The point of this discussion is that many minorities residing in the target counties at issue in this case — especially those who are forty or older — attended segregated schools. This is precisely the age group from which one would expect state district court judges to be drawn. How one can say that this past discrimination does not .hinder the current ability of blacks and Hispanics to participate in the political process involving the election of state district court judges escapes me.

. The majority holds that Plaintiffs can only show depressed political participation by pointing to low voter registration or low voter turnout rates. Based on this holding, it reverses as clearly erroneous the district court's finding that blacks and Hispanics throughout the State of Texas continue to bear the effects of past discrimination, which hinder their ability to participate in the political process. Thus, while the majority uses the lack of minority lawyers against the Plaintiffs with respect to the inquiry into the number of minority judges, it ignores the lack of minority lawyers on the question of whether the lingering socioeconomic effects of discrimination hinder the ability of blacks and Hispanics to participate in the political process. This is absurd.

. There is also testimony in the record suggesting that the ability of minorities to run in countywide elections is hampered by their lack of financial resources. The majority, after weighing this evidence with other evidence suggesting that minorities were able to raise funds, finds that minorities were able to run well-financed campaigns. It thus concludes that the testimony from several witnesses about minority candidates’ lack of financial resources does not support the district court's finding that the lingering socioeconomic effects of discrimination hinder the ability of minorities to participate effectively in district court elections. I disagree. In my view, the testimony of these witnesses, as well as Dr. Brischelto's expert testimony on the subject, provide further support for the district court's finding in this regard.
Moreover, as I noted in my earlier opinion, the issue of whether blacks and Hispanics continue to suffer the effects of discrimination — effects that hinder their ability to participate in the political process — was not a contested issue at trial and has not been pursued by the parties on appeal, See LULAC III, 986 F.2d at 782-83 n. 41. The majority's decision to pursue this issue and reverse the district court's finding on clearly erroneous grounds is, thus, a further indication of its insistence on cleaning up — or cleaning out — section 2.

. In reversing the district court’s findings of vote dilution, the majority places heavy emphasis on the fact that, in several of the counties, white majorities voted for Republican minority judicial candidates. It also creates the impression that the Republican Party aggressively recruited minority candidates in all of the counties at issue. Majority Opinion at 861. This picture is not entirely accurate.
While there was evidence in Dallas County that two black Republican district court candidates were elected with the support of the white majority, there was also expert testimony, based on a telephone survey, that most voters in Dallas County had absolutely no idea of the race of the candidate for whom they were voting. At most, then, this evidence shows that white voters in Dallas County could not have been motivated by specific racial animus toward candidates. But this is only because of the so-called anonymity factor. There was also, admittedly, evidence suggesting that the Republican Party in Dallas County attempted to recruit minority candidates.
As for the other counties, however, there is little, if any evidence that white majorities would support Republican minority candidates in district court elections. This is because, as best I can tell from the record: (1) in Harris County, only one black Republican district court candidate won a contested district court election; (2) in Bexar County, only one Hispanic Republican won a contested district court election; and (3) *917 in Tarrant County, only one black Republican won a contested district court election. This lack of Republican minority district court candidates also calls into question the majority's assertion that the Republican Party actively recruited minority candidates in other counties. There is very little evidence of any such recruitment in counties other than Dallas.

. Indeed, as I noted in my earlier opinion in this case, with respect to Harris County, the parties specifically argued in the district court (and requested a fact finding) that “Blacks and Hispanics together in Harris County do not constitute a politically cohesive minority group.” See LULAC III, 986 F.2d at 789. And in Tarrant County, no party ever requested a fact finding that blacks and Hispanics are politically cohesive. See id. at 799-800 n. 49.
The majority asserts that the parties’ failure to request a finding on the question of whether blacks and Hispanics in Harris and Tarrant counties is beside the point. It argues that the claim raised on appeal is that the district court improperly refused to consider elections involving Hispanic candidates, elections studied by the State of Texas’ own expert. This latter question, the majority asserts, "is most assuredly before” this court. I disagree.
The State of Texas, in a reply brief to the original panel that heard this case in 1990, raised this issue for the first time on appeal. It asserted:
If [a coalition of blacks and Hispanics] can be proved by voting rights plaintiffs in order to help them meet the first two Gingles preconditions, what prevents voting rights defendants from proving the existence of such a de facto coalition in order to shed light on whether the third Gingles precondition can be met? The district court denied the State Officials that opportunity in the targeted counties, including Harris and Tarrant Counties, by treating as irrelevant the numerous races analyzed there involving Anglo judicial candidates versus His-panic judicial candidates....
Thus, the defendants "raised” this issue by asking a rhetorical question in a reply brief. Even if there were nothing to prevent voting rights defendants from proving the existence of a de facto coalition between blacks and Hispanics in Harris and Tarrant counties, the problem with the argument is that the State of Texas simply did not seek to prove this fact in front of the district court and, with regard to Harris County, expressly requested a fact finding to the contrary.

. The majority curiously does not feel the need to revisit our decision in Campos v. City of Baytown, 840 F.2d 1240, 1244 (5th Cir.1988), cert. denied, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1988) — despite the fact that several of my colleagues obviously disagree with the principle of allowing minorities to proceed as a coalition under section 2. See Campos v. City of Baytown, 849 F.2d 943 (5th Cir.1988) (Higginbotham, J., joined by Gee, Garwood, Jolly, Davis, and Jones, JJ., dissenting from denial of rehearing en banc); League of United Latin American Citizens, Council No. 4386 v. Midland Indep. Sch. Dist., 812 F.2d 1494, 1503 (5th Cir.1987) (Higginbotham, J., dissenting).

. Before the Supreme Court’s decision in Houston Lawyers’ Association v. Attorney General of Texas, - U.S. -, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991), courts considered, in the liability phase of a section 2 case, only whether the state’s interest in the current electoral scheme was tenuous. Although I have some questions as to whether the Court, in Houston Lawyers’ Association, meant to change the inquiry and require proven vote dilution to be balanced against non-tenuous state interests, see LULAC III, 986 F.2d at 757-64, I recognize that the Court’s opinion in that case can be read to require such balancing. See also Robert B. McDuff, Judicial Elections and the Voting Rights Act, 38 Loy.L.Rev. 931, 958-60 (1993).

. Even Chief Justice Phillips has publicly recognized that a system using limited and cumulative voting could remedy the dilutive aspect of Texas’ current at-large election system. In his recent State of the Judiciary Address, he noted that ”[m]inority voters could be protected by any method which permits votes to be aggregated or limits each voter to fewer votes than the number of positions to be filled.” H.J. of Tex., 73d Leg., R.S. 479, 483 (1993). He further stated that, "[w]hile little used in judicial elections, such procedures have long been used in both public and private elections around the world.” Id.

. The general rule is that, for purposes of determining whether a suit in federal court is barred by the Eleventh Amendment, an official-capacity lawsuit is a suit against the state itself rather than a suit against the named official. In Kentucky v. Graham, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985), the Court explained:
Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. See, e.g., Scheuer v. Rhodes, 416 U.S. 232, 237-38 [94 S.Ct. 1683, 1687, 40 L.Ed.2d 90] (1974). Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent.” Monell v. New York City Dept. of Social Services, 436 U.S. 658, 690 n. 55 [98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611] (1978). As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. Brandon [v. Holt, 469 U.S. 464, 471-72, 105 S.Ct. 873, 878, 83 L.Ed.2d 878 (1985)]. It is not a suit against the official personally, for the real party in interest is the entity.
(emphasis in original). Official-capacity lawsuits, because they are in essence lawsuits against the state, are generally barred by the Eleventh Amendment. See Kentucky v. Graham, 473 U.S. at 167 n. 14, 105 S.Ct. at 3106 n. 14 ("Unless a State has waived its Eleventh Amendment immunity or Congress has overridden it, ... a State cannot be sued directly in its own name regardless of the relief sought.”) (citing Alabama v. Pugh, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978)).
There is an exception to this rule. Specifically, "[i]n an injunctive or declaratory action ground *922 ed on federal law, the State’s immunity can be overcome by naming state officials as defendants.” Kentucky v. Graham, 473 U.S. at 169 n. 18, 105 S.Ct. at 3107 n. 18. As the Supreme Court itself has recognized, this exception is based purely upon a legal fiction. See, e.g., Pennsylvania v. Union Gas Co., 491 U.S. 1, 26, 109 S.Ct. 2273, 2287, 105 L.Ed.2d 1 (1989) (recognizing that Ex Parte Young established a "fiction”); Cory v. White, 457 U.S. 85, 95, 102 S.Ct. 2325, 2331, 72 L.Ed.2d 694 (1982) (referring to "fiction of Ex Parte Young"); Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 105, 104 S.Ct. 900, 910, 79 L.Ed.2d 67 (1984) (same). Under this fiction, because state officers have no authority to violate federal law, their illegal acts, although qualifying as "state action,” are not "acts of the state”; therefore suits to enjoin those acts or to declare them illegal are not precluded by the Eleventh Amendment. See Young, 209 U.S. at 159-60, 28 S.Ct. at 454. Thus, under the Young fiction, "official capacity actions for prospective relief are not treated as actions against the State” for purposes of the Eleventh Amendment. Kentucky v. Graham, 473 U.S. at 167 n. 14, 105 S.Ct. at 3106 n. 14. But see also Diamond v. Charles, 476 U.S. 54, 57 n. 2, 106 S.Ct. 1697, 1701 n. 2, 90 L.Ed.2d 48 (1986) (noting, in context of suit against state officials for declaratory and injunctive relief, that "[a] suit against a state officer in his official capacity is, of course, a suit against the State”).

. See Tex.Rev.Civ.Stat Ann. art. 601b, § 10.11 (Vernon Supp.1987) (providing that the attorney general "shall represent the [State Purchasing and General Services Commission] before the courts in all appeals from rate cases in which the commission intervenes”); Tex.RevCiv.Stat.Ann. art. 1446c, § 15 (Vernon Supp.1987) (providing that the attorney general shall represent the Public Utilities Commission "in all matters before the state courts, and in any court of the United States, and before any federal public utility regulatory commission”).

. As explained more fully below, district attorneys and county attorneys also have the authority to represent the state in some circumstances. See Tex. Const, art. V, § 21; see also Baker v. Wade, 769 F.2d 289, 291 (5th Cir.1985), cert. denied, 478 U.S. 1022, 106 S.Ct. 3338, 92 L.Ed.2d 742 (1986).

. I say "curiously” because Chief Justice Phillips has never sought to represent the interests of the state in this appeal. At oral argument, when he was specifically asked whether he was seeking to represent the state on appeal from the liability decision, Chief Justice Phillips said that he was not. That is, he made it clear that his complaints go only to the specifics of the proposed settlement — not to the idea of settling this case in general. Indeed, in a speech to the Texas legislature, Chief Justice Phillips conceded that, regardless of the outcome in this litigation, the current system of electing district judges is indefensible. He explained:
Let there be no mistake: the current at-large system is no longer acceptable. In Dallas County, 37% of the people, but less than 14% of the judges, are African-American or Hispanic. In Harris County, 42% of the people, but less than 9% of the judges, are from the same minority populations. Candidates from these racial and ethnic groups have often been defeated in campaigns for benches in those counties. The federal courts may ultimately hold that the evidence presented in pending litigation is insufficient to demonstrate that the system is illegal, but they cannot make it fair or right. The status quo is unjust and inequitable.
H.J. of Tex., 73d Leg., R.S. 479, 482 (1993) (Address of Chief Justice Thomas R. Phillips); see also id. at 481 ("One thing can be said with confidence about our current system of choosing judges: No one likes it.”).

. I recognize, of course, that the mere fact that the Attorney General has executed a settlement agreement on behalf of the state will not support the entry of a consent decree. The district court must hold a hearing on the propriety of the settlement and consider the objections of all interested parties. But the Plaintiffs and the State of Texas are not asking this court to enter a decree based on the specific settlement that the Attorney General negotiated and approved. Rather, they are only requesting a remand on the basis of the parties' expressed desire to settle this lawsuit.
I also am aware that, under Texas law, "[a]n admission, agreement, or waiver made by the attorney general in an action or suit to which the state is a party does not prejudice the rights of the state.” Tex.Gov't Code Ann § 402.004 (Vernon 1990). However, "the weight of authorities interpreting section 402.004 shows it to be a legislative limitation on the affirmative powers and discretion granted to the attorney general.” Texas Dep't of Human Servs. v. Green, 855 S.W.2d 136 (Tex.App. — Austin 1993, n.w.h.). That is, the section has not been construed to limit the Attorney General's constitutional authority to propose, negotiate, and execute settlement agreements on behalf of the State of Texas — despite arguments to the contrary. See Terrazas, 829 S.W.2d at 728 n. 5, 733 n. 5 (concurring opinions of Justice Gonzalez and Cornyn); see also Executive Condominiums, Inc. v. State, 764 S.W.2d 899, 902 (Corpus Christi 1989, writ denied) (rejecting argument that section 402.004 prevented Attorney General from compromising and settling claims on behalf of the state).

. Indeed, in the context of discussing the rights of a permissive intervenor, this court has stated:
[T]he [permissive] intervenor’s mere presence in an action does not clothe it with the status of an original party. To be sure, there are some senses in which an ''intervenor is treated as if he were an original party and has equal standing with the original parties.” The permissive intervenor can, among other things, move to dismiss the proceeding and can challenge the subject matter jurisdiction of the district court. But these participatory rights remain subject to the intervenor's threshold dependency on the original parties' claims, for it is equally well-settled that ”[a]n existing suit within the court’s jurisdiction is a prerequisite of an intervention, which is an ancillary proceeding in an already instituted suit.”
Harris v. Amoco Production Co., 768 F.2d 669, 675 (5th Cir.1985) (emphasis added) (internal citations omitted), cert. denied, 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986); see also Kirkland v. New York State Dep't of Correctional Servs., 711 F.2d 1117, 1126 (2d Cir.1983) (”[T]he sum of rights possessed by an intervenor, even if granted unconditional intervention, is not necessarily equivalent to that of a party in a case and depends upon the nature of the intervenor's interest.’’), cert. denied, 465 U.S. 1005, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984).

. The majority concludes that Judge Wood and Judge Entz were also permitted to intervene in their capacity as voters of Harris and Dallas county. The record belies this conclusion.
In her motion to intervene filed in the district court, Judge Wood asserted:
As a state district judge, duly elected at large in November, 1988, to a four-year term of office in an expressly targeted county, Harris County District Judge Wood has a direct and substantial interest in the outcome of this suit in both her personal and her official capacity in that she stands to have here election declared null and void and her tenure in office drastically truncated should Plaintiffs obtain the relief they seek. ■
In support of her motion, Judge Wood cited Williams v. State Board of Elections, 696 F.Supp. 1563 (N.D.Ill.1988), a case dealing specifically with whether sitting elected judges should be joined as necessary parties in a section 2 case challenging judicial elections. At no point in her motion, or in her supporting memorandum, does Judge Wood assert that she is entitled or should be allowed to intervene as a voter. In fact, she does not allege that she is a registered voter of Harris County. Thus, unlike the majority, I cannot say that she was permitted to intervene as a registered voter.
In his motion to intervene, Judge Entz similarly focuses his arguments on why he should be allowed to intervene as a sitting elected judge of Dallas County. He also alleges that he is a resident of Dallas County and is duly qualified and registered to vote in the county. He then states, that "as such” he has an “interest in the fair administration of justice in Dallas County and the selection of a qualified judiciary.” However, in his supporting memorandum, he never again mentions his status as a voter. Rather, like Judge Wood, he relies solely on the Williams case to support his motion to intervene. Therefore, I am unable to conclude that he was permitted to intervene to protect his interest — if, indeed, he has any such interest — in voting for all of the judges in Dallas County.

.Had the Attorney General moved to dismiss the notice of appeal filed on behalf of the State of Texas, however, we might be presented with another situation entirely. See Diamond v. Charles, 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). The majority does not think so, but, in my view, there are serious questions about whether Judge Wood and Judge Entz, as sitting elected judges, would have standing to maintain an appeal from an order which only declares the current method of electing judges to be illegal. Moreover, even assuming that they were allowed to intervene as registered voters, I have reservations about the correctness of the Eleventh Circuit’s decision in Meek v. Metropolitan Dade County, 985 F.2d 1471 (11th Cir.1993), which held that voters had standing to intervene and independently appeal from a district court’s decision declaring Dade County’s at-large election scheme invalid. The question in such cases is not whether white voters such as Judge Wood and Judge Entz, who seek to defend the status quo, would have standing to file a claim under section 2, but whether they would have standing to attack the order of the district court — that is, whether they have suffered an injuiy in fact as a result of the district court’s liability decision. See Sierra Club v. Babbitt, 995 F.2d 571 (5th Cir.1993) ("Where standing to appeal is at issue, appellants must demonstrate some injury from the judgment below.") (emphasis in original).

. As discussed supra Part I.A.I., Chief Justice Phillips was apparently named as a Young defen *928 dant — in order to get around the Eleventh Amendment bar to suits brought directly against the state. To come within the rule of Young, however, the officials who are named as defendants “must have some connection with the enforcement " of the state law being challenged. See Young, 209 U.S. at 157, 28 S.Ct. at 453 (emphasis added). Otherwise, the named official has only been made “a party as a representative of the state” in an “attemptf] to make the state a party.” Id. When officials who arc not charged with enforcing the challenged state law are joined as parties, therefore, the proper course is dismissal.
Assuming section 2 does not waive a state’s Eleventh Amendment immunity, the Plaintiffs correctly named the Texas Attorney General and the Secretary of State in their official capacities. After all, both are responsible for enforcing the current method of electing district court judges. However, the members of the Texas Judicial Districts Board (including Chief Justice Phillips), have legislative responsibilities — responsibilities that arise only if the Texas legislature fails to act. See Tex Const, art. 5, § 7a(e). They have no enforcement responsibilities whatsoever. Thus, in my mind there is a question as to whether the Plaintiffs' action against the members of the Judicial Districts Board, including Chief Justice Phillips, are barred by the Eleventh Amendment.

. I recognize, of course, that the district court would have to conduct an evidentiary hearing on the proposed settlement and that Chief Justice Phillips’ objections to the proposed settlement would have to be fully aired. The point is that, at this time, all the parties are seeking is a remand; they are not seeking this court’s stamp of approval on the current proposed settlement.

. An argument can be made that the settlement proposed in the Chisom case — a settlement which had the effect of temporarily adding an eighth seat to the Louisiana Supreme Court— offended the Louisiana Constitution. See La. Const, art. V, § 3 ("The supreme court shall be composed of a chief justice and six associate *929 justices, four of whom must concur to render judgment.”). As the majority correctly notes, Louisiana's effort to amend the constitution to add an extra position had failed. See Majority Opinion at 848 n. 19. The point is that, before remanding, we never considered this question in Chisom.

. Our discussion in Overton, happily enough, is consistent with the Texas Supreme Court's decision in Terrazas. In that case, a plurality of the members of the Texas Supreme Court recognized that a state district court could enter a consent decree, based on a settlement between the Attorney General and the plaintiffs, which effectively reapportioned the state legislative districts. It noted, however, that the entry of such a consent judgment required some procedural regularity (i.e., the state district judge would have to carefully consider the many interests involved, give due deference to the legislature to rectify its own statutes, and give due regard for the effect of the .order on the election process). See 829 S.W.2d at 718. The plurality in Terrazas also suggested that court-ordered reapportionment based on such a settlement would be prohibited absent a judicial determination that the current statute was invalid. See id. at 722. Once there is a judicial determination that the current statute is invalid, under the plurality opinion in Terrazas, a state district court would be able to enter a consent decree based on a settlement agreement executed by the Attorney General. In short, neither Overton nor Terrazas requires a final, non-appealable finding of liability before a court can override a provision of state law.